CHRISTINE V. SAMA (*pro hac vice* forthcoming)
CSama@goodwinlaw.com
HUIYA WU (*pro hac vice* forthcoming)
HWu@goodwinlaw.com
TIMOTHY KEEGAN (*pro hac vice* forthcoming)
TKeegan@goodwinlaw.com
ARSHJIT RAINCE (*pro hac vice* forthcoming)
ARaince@goodwinlaw.com
SAMUEL A. KUNZMAN (*pro hac vice* forthcoming)
SKunzman@goodwinlaw.com
**GOODWIN PROCTER** LLP
620 Eighth Avenue
New York, NY 10018
Tel.: +1 212 813 8800

ISHIKA DESAI (SBN 340239)
IDesai@goodwinlaw.com
**GOODWIN PROCTER** LLP
525 Market Street, Floor 32
San Francisco, CA 94105
Tel.: +1 415 733 6000

*Attorneys for Plaintiffs*
*Ayr Energy Inc., Anirudh Reddy Edla,*
*and Chad Stuckey*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| AYR ENERGY INC.; ANIRUDH REDDY EDLA; and CHAD STUCKEY<br><br>Plaintiffs,<br><br>v.<br><br>ZETWERK MANUFACTURING USA INC.; ZETWERK MANUFACTURING BUSINESSES PRIVATE LIMITED; and UNIMACTS GLOBAL, LLC<br><br>Defendants. | Case No. 3:25-cv-10345<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Ayr Energy Inc. ("Ayr Energy" or "Ayr"), Anirudh Reddy Edla ("Mr. Reddy"), and Chad Stuckey (collectively, "Plaintiffs") bring this action against Defendants Zetwerk Manufacturing USA Inc. ("Zetwerk US"), Zetwerk Manufacturing Businesses Private Limited ("Zetwerk India" and, collectively with Zetwerk US, "Zetwerk" or the "Zetwerk Defendants"), and Unimacts Global, LLC ("Unimacts") (collectively, "Defendants") as follows.

## INTRODUCTION

1.     This case concerns a series of unfair, illegal, and anticompetitive acts taken by Defendants—a multi-billion dollar conglomerate—designed to squash upstart competitor Ayr Energy, and cut the legs out from under Ayr Energy's successful and more-innovative business.

2.     Defendants are a new entrant into the United States transformer market and are trying to beat Ayr Energy to the front of the market.  But rather than use their resources to compete on the merits like the law requires, Defendants have spent nearly a year trying to restrain and bully Ayr Energy out of the market through unfair, abusive, and illegal tactics.

3.     Defendants' unlawful attacks on Plaintiffs include:

    a. attempting to intimidate and immobilize Mr. Reddy, Ayr Energy's CEO, by withholding earned pay, threatening to cancel his Employee Stock Option Plan and subsequently attempting to coerce him into signing a post-resignation non-compete;

    b. intentionally interfering with Ayr Energy's financing through defamatory and tortious communications to actual and potential investors;

    c. filing a baseless, pretextual suit in India and then failing to prosecute it;

    d. further abusing the legal process by using the India lawsuit to improperly attempt to fish into Ayr Energy's records through a 28 U.S.C. § 1782 discovery application in Delaware;

    e. filing another baseless suit in Texas, where there is no jurisdiction over Ayr Energy, Mr. Reddy or Mr. Stuckey, in an effort to forum shop;

    f. undertaking a defamatory media smear campaign to damage Ayr Energy's reputation with potential customers, investors, and the public; and

g. falsely and misleadingly advertising their products and capabilities as part of a "fake it 'til you make it" marketing campaign, including by claiming extensive experience and success in the custom transformer space when, in actuality, they lack experience in that space and cannot even correctly specify the transformers recently added to their website.

4. Although it has been and continues to be harmed, and irreparably so, Ayr Energy has withstood these attacks to date thanks to the success of its innovative business.

5. Defendants' lawsuits have no legitimate basis, and their co-founder admitted as much to Mr. Reddy.

6. Nevertheless, Defendants have concocted a tale of trade secret misappropriation and are doing everything to publicize it, including by spreading defamatory misinformation and unsubstantiated allegations to the media and other third parties.

7. But, Defendants cannot substantiate these allegations because there is no basis for Defendants' misappropriation claims. Instead, they have desperately engaged in a fishing expedition that overreaches into Ayr Energy's files in multiple jurisdictions.

8. Indeed, Defendants have failed at every turn, and **before three different courts**, to provide any detail about what so-called "trade secrets" were "misappropriated."

9. This fatal deficiency is why Defendants did not file suit in this Court, the proper venue for any alleged trade secret misappropriation dispute. Instead, they forum shopped, filing a complaint in a Texas state court, a court without personal jurisdiction in an effort to avoid having to identify their "trade secrets" with particularity before demanding abusive discovery.

* * *

10. Defendants' attacks are serious. They are designed to wipe Ayr Energy out and, in the process, turn the clock back on Ayr Energy's industry-changing innovation. That is why Defendants have baselessly demanded relief in India and Texas that would push Ayr Energy out of business.

11. Mr. Reddy and Mr. Stuckey are not the only former Zetwerk employees to have been subjected to Defendants' bully playbook. Defendants have enlisted many, if not all, of these

2

1    same tactics against multiple other former employees as part of efforts to punish those employees

2    for trying to leave Zetwerk and to stifle competition.

3        12.    Plaintiffs will not allow themselves to become the latest victims of Defendants'

4    tyranny.  After months of fighting back against Defendants' baseless allegations and improper

5    conduct in three courts, and recognizing that Defendants will not otherwise cease their efforts to

6    interfere with Ayr Energy's business, Plaintiffs filed this suit to hold Defendants accountable for

7    their actions and to vindicate Plaintiffs' rights.

8                              **NATURE OF THE ACTION**

9        13.    This is an action for unfair competition, trade libel, defamation, tortious interference

10   with prospective economic relations, abuse of process, violation of California labor laws, breach of

11   contract, and false advertising.  This also is an action under the Declaratory Judgment Act, 28

12   U.S.C. §§ 2201 and 2202 that seeks declaratory judgments of no breach of contract, contract

13   unenforceability, no trade secret misappropriation under federal and state laws, no breach of

14   fiduciary duty, and no aiding and abetting breach of fiduciary duty.

15                                **THE PARTIES**

16       14.    Plaintiff Ayr Energy is a Delaware corporation with its principal place of business

17   in Mountain View, California.

18       15.    Plaintiff Anirudh Reddy Edla is an individual residing at 605 E. Evelyn Ave, Unit

19   6201, Mountain View, California 94041.  Mr. Reddy is Ayr Energy's CEO and one of its co-

20   founders.  Mr. Reddy was formerly an employee of Zetwerk US, Zetwerk India, and, according to

21   Defendants, Unimacts.

22       16.    Plaintiff Chad Stuckey is an individual residing at 4892 Beck Road, Emmaus,

23   Pennsylvania 18049.  Mr. Stuckey is a former Unimacts employee and current Ayr Energy

24   employee.

25       17.    Defendant Zetwerk US is a Delaware corporation with its principal place of business

26   at 548 Market St. #70774, San Francisco, California 94104.

27

28

18.     Defendant Zetwerk India is an Indian private limited company with its principal place of business and registered office at #84/1, 2nd & 3rd Floor, Vaishnavi Sovereign, Green Glen Layout, Bellandur, Bangalore, Karnataka, India, 560103.

19.     Defendant Unimacts is a Nevada limited liability company with its principal place of business at 14600 Arville St., Sloan, Nevada 89054.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over Plaintiffs' Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), subject matter jurisdiction over Plaintiffs' state law unfair competition claim pursuant to 28 U.S.C. § 1338(b), subject matter jurisdiction over Plaintiffs' claim under the Defend Trade Secrets Act ("DTSA") pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367.

21.     This Court has personal jurisdiction over Defendant Zetwerk US because Zetwerk US's principal place of business is within this District, at 548 Market Street #70774, San Francisco, California 94104[1] and Zetwerk India's founders Amrit Acharya and Srinath Ramakkrushnan routinely directed and controlled Zetwerk US's activities from, and participated in meetings in, the District.

22.     In addition, the Court has personal jurisdiction over Mr. Reddy's claims against Defendant Zetwerk US under California Labor Code § 925, which provides that Mr. Reddy is entitled to litigate his claims against his former employer Zetwerk US in California because he is a California resident who cannot be made to adjudicate outside of California a claim arising in California, or deprived the substantive protection of California law with respect to a controversy arising in California.

23.     This Court has personal jurisdiction over Defendant Zetwerk India because Zetwerk India is a foreign company that is subject to personal jurisdiction in any state's court of general jurisdiction pursuant to Fed. R. Civ. P. 4(k)(2) based on its contacts with the United States described

---

[1] *See Unimacts Glob., LLC v. Ayr Energy Inc.*, 2025-79599, D.I. 1 ¶ 9 (D. Ct. Harris Cnty. Tex. Oct. 17, 2025) (Complaint filed by Zetwerk US, *inter alia*).

1  herein and, alternatively, because Zetwerk India pleaded to an Indian Court that it is an alter-ego

2  for Zetwerk US.

3      24.    The Court has personal jurisdiction over Mr. Reddy's claims against Zetwerk's

4  wholly-owned subsidiary Unimacts under California Labor Code § 925 because Zetwerk claims

5  Mr. Reddy also separately worked as a Unimacts employee (serving as the company's interim

6  CEO) while residing in California.

7      25.    Unimacts is further subject to personal jurisdiction because Defendants' position is

8  that Unimacts is an alter-ego for Zetwerk.  According to Zetwerk they "treat Unimacts as [their]

9  Division / Business Unit" (*i.e.*, as just a part of Zetwerk).  To this point, Zetwerk openly claims to

10  leverage Zetwerk employees for Unimacts work and *vice versa*, without having both entities

11  formally hire the employees.  This includes Mr. Reddy, who was hired as a Zetwerk employee but

12  directed to perform numerous tasks for Unimacts without a formal employment agreement with the

13  company, including serving as the company's interim CEO.

14      26.    Furthermore, this Court has personal jurisdiction over all Defendants because

15  Defendants' intentional tortious conduct described herein has been directed to this District,

16  including because Mr. Reddy resides in the District and Ayr Energy's principal place of business

17  is in the District.  Therefore, all Defendants knew that their actions would harm both Mr. Reddy

18  and Ayr Energy in this District.  In addition, Defendants defamed Plaintiffs to third parties residing

19  in this district; tortiously interfered with Plaintiffs' relationships in California, including with

20  venture capital firms in this District; and directed accusations and demands to Plaintiffs in this

21  District.

22      27.    Further, a substantial portion of the events giving rise to Defendants' allegations

23  against Plaintiffs occurred within this District, where Mr. Reddy previously worked for Defendants

24  and from where Defendants allege their alleged trade secrets were misappropriated.

25      28.    Finally, in response to Defendants' misconduct and demands, Ayr Energy and

26  Mr. Reddy, who reside in this District, took actions to address and allay Defendants.

27

28

5

29.     Venue is proper in this judicial District for all claims under 28 U.S.C. § 1391(b)(2) and, alternatively, under 28 U.S.C. § 1391(b)(3).[2]

30.     This Court has declaratory judgment jurisdiction over Plaintiffs' declaratory judgment claims because an actual case and controversy exists between the parties within the scope of this Court's jurisdiction pursuant to 28 U.S.C. § 2201(a).  Indeed, Defendants have accused Plaintiffs of trade secret misappropriation and other violations and have instituted legal action against a subset of Plaintiffs in incorrect forums.  More specifically, Defendants improperly filed a lawsuit in Texas state court against Ayr Energy (but not Mr. Reddy or Mr. Stuckey) alleging that Ayr Energy is liable for trade secret misappropriation and aiding and abetting breaches of an alleged fiduciary duty to Defendants.  Plaintiffs dispute these contentions.

31.     This Court has supplemental jurisdiction over Mr. Stuckey's declaratory judgment claims against Defendants under 28 U.S.C. § 1367(a) because Mr. Stuckey's claims are so related to those of Ayr Energy and Mr. Reddy that they form part of the same case or controversy under Article III of the United States Constitution.

## FACTUAL BACKGROUND

### A.  Plaintiff Ayr Energy

32.     Ayr Energy was founded by Plaintiff Mr. Reddy, Rahul Arora, and Yashashvi Takallapalli in 2024.

33.     Ayr Energy's founders have known each other for many years, since they attended university together at the Indian Institute of Technology, Madras.

34.     Plaintiff Mr. Reddy is currently Ayr Energy's CEO.

35.     Plaintiff Mr. Stuckey currently works in business development at Ayr Energy.

36.     Ayr Energy's founders began to discuss what would become Ayr Energy in or around May 2024.  Shortly after, in September 2024, Ayr Energy was incorporated as an original

---

[2] Mr. Reddy is not required to file suit against Defendants in Delaware based on a forum selection clause in his Zetwerk US employment agreement.  As explained below, that forum selection clause may be rendered void under California Labor Code § 925(b) at Mr. Reddy's request "and [this] matter shall be adjudicated in California and California law shall govern the dispute."

equipment manufacturer ("OEM") that designs, delivers, and installs major electrical power equipment, including transformers, which are key aspect of Ayr Energy's business.

37.    Ayr Energy's broad business plan was conceived in response to public reports of bottlenecking and supply gaps in the transformer manufacturing market that began to arise in 2023 and worsened in 2024.[3]

38.    Ayr Energy's business model is unique and effective because Ayr Energy utilizes skilled and experienced engineers to design bespoke power equipment.  On the design side, this enables Ayr Energy to address specific customer requirements and circumvent supply chain constraints.  Then, Ayr Energy contracts with established factories in India to manufacture equipment to its design before shipping the equipment to the customer's site, installing it, and commissioning it.

39.    To develop the foundation of this business concept, Ayr Energy enlisted multiple transformer industry veterans and experts, some with as many as five decades of experience, who helped them build their business model, with special attention on the underserved U.S. market.

40.    Ayr Energy's business model sets it apart from traditional OEMs that design the equipment but manufacture in-house.  It also sets Ayr Energy apart from companies that do not design products and, instead, offer brokerage-style procurement and logistics platforms like Zetwerk, which monetize other companies' products, skills and ingenuity.

---

[3] *See, e.g.*, U.S. Gov't Accountability Off., *GAO-23-106180 DOE Could Better Support Industry Efforts to Ensure Adequate Transformer Reserves* 2 (2023), https://www.gao.gov/assets/gao-23-106180.pdf ("[Electric] [u]tilities identified supply chain constraints as the most pressing challenge, including long (and increasing) manufacturing lead times, limited manufacturing capacity, and labor and material shortages."); Nat'l Infrastructure Advisory Council, *Addressing the Critical Shortage of Power Transformers to Ensure Reliability of the U.S. Grid* 3 (2024), https://www.cisa.gov/sites/default/files/2024-09/NIAC_Addressing%20the%20Critical%20Shortage%20of%20Power%20Transformers%20to%20Ensure%20Reliability%20of%20the%20U.S.%20Grid_Report_06112024_508c_pdf_0.pdf ("During the COVID-19 pandemic, the transformer manufacturing industry was among those that experienced severe supply chain disruptions—and the impact of those disruptions have only become more pronounced in subsequent years," including because "[r]ising demand for transformers has exacerbated supply chain challenges.").

41.     Ayr Energy quickly attracted potential investors to its business, and shortly after its founders secured term sheets from venture capital funds and then completed its share subscription process in December 2024, the company's business took off.

42.     Transformers are a cornerstone of Ayr Energy's business.  Transformers are large devices that serve as the backbone of the modern electrical grid, enabling the efficient, safe, and reliable transmission and distribution of electricity over vast distances.  Transformers are what make large-scale electrical power delivery possible.

43.     Ayr Energy serves as an OEM for critical power equipment, including high-capacity power transformers, distribution (medium-voltage) transformers, special-purpose transformers, high-voltage circuit breakers, and medium-voltage switchgear—all of which Ayr Energy designs, delivers, and installs.

44.     The transformer business can be very lucrative if done right, but that is not an easy task.  There can be substantial bottlenecks in power-equipment supply chains:  long lead times (the time from a customer's order to delivery), escalating costs, and growing demand from sectors like data centers, renewable energy and utilities.  In addition, products need to be designed to meet the unique requirements of each project, and they need to last for 30-40 years in harsh conditions.  The experience and know-how to build such high-quality equipment is rare.

45.     Ayr Energy was founded in response to these bottlenecks and issues, as Mr. Reddy and his co-founders were inspired by the opportunity to solve these problems.

46.     Ayr Energy is uniquely positioned to mitigate delays and deliver superior products because Ayr Energy took the time to invest in building itself as a company specifically designed to address them.  This included initially bringing in experts, consultants, and advisors who helped shape the company to address these issues from the start.  Ayr Energy has a team of specialized, experienced engineers who can design transformers to meet the unique requirements of each project in the U.S. and do so more quickly than others.

47.     Overall, Ayr Energy's approach significantly reduces "lead time," which is among the most important considerations for customers in this market.

48.     Ayr Energy's combination of quality and rapid delivery gives it a commercial advantage, particularly over middleman companies like Zetwerk, which were not structured to focus on transformers, lack high-quality in-house design capabilities, and rely on third parties.

**B.  Defendants Zetwerk and Unimacts**

49.     Zetwerk is a supply chain management company founded in 2018 by Amrit Acharya and Srinath Ramakkrushnan that is headquartered in Bangalore, India.  Since 2021, Zetwerk has operated in the United States through its Untied States subsidiary, Zetwerk US.

50.     Zetwerk has significant resources; in 2024 alone, the company reported generating nearly $2 billion in revenue.[4]

51.     Zetwerk's success is not derived from a revolutionary product, a novel business method, or engineering ingenuity.  Instead, Zetwerk operates an old-fashioned, middleman platform.  It delivers third-party OEM products to customers.  Historically, these products include extrusions, die-cast components, toleranced components, forged components, injection molded components, sheet metal stamped components, prototypes, and investment cast components.[5] Zetwerk's customers operate in a variety of industries, including transportation; industrial machinery & equipment; consumer products, electronics & appliances; construction & infrastructure; energy & utilities; aerospace & defense; and solar.[6]

52.     Zetwerk's middleman model primarily relies on relationships with third parties who provide products that Zetwerk then collates, quality checks, and delivers to consumers, skimming a margin off the top in exchange for these services.

53.     Zetwerk was able to grow and thrive despite its simplistic business model because it leveraged private equity funding for a series of mergers and acquisitions with companies that had already established themselves in target verticals, many of which are credentialed within the

---

[4] Tapas Sarkar, *Zetwerk's Rise from Statrtup to Manufacturing Powerhouse in Just Seven Years*, Clairfield Outlook (2025),  https://www.clairfield.com/wp-content/uploads/2025/03/Buy-build-rise-how-Zetwerk-does-it.pdf.
[5] *Zetwerk's Manufacturing Capabilities*, Zetwerk, https://www.zetwerk.com/en-us/capabilities/ (last visited Dec. 1, 2025).
[6] *Zetwerk For Manufacturers*, Zetwerk, https://www.zetwerk.com/en-us/industries/ (last visited Dec. 1, 2025).

manufacturing industry.[7]  Zetwerk then took advantage of these entities' pre-existing networks and relationships with third parties.[8]

54.     Zetwerk acquired one such company, Defendant Unimacts, in or around September 2022.

55.     Unimacts was founded in 2002 as a supply chain management company specializing in renewable energy components.  Unimacts historically focused its business on renewables like wind, though it just "recently expanded its solar manufacturing footprint in North America."[9]

56.     Zetwerk, continuing its *modus operandi* of acquiring entities and subsuming their relationships, "treat[ed] Unimacts as a Division / Business Unit" of Zetwerk.  In other words, Unimacts is a part of Zetwerk's middleman platform business.

57.     None of Zetwerk, Unimacts, or any company in the Zetwerk family historically focused on the sale of transformers.  And they certainly did not focus on selling *custom-made* transformers, much less designing them.

58.     By mid-2024, Zetwerk had limited experience selling third-party transformers, and their website and marketing materials reflected as much.

59.     And, at that time, Zetwerk had no interest in designing custom transformers, much less any plans to do so.  Zetwerk's own founder Amrit Acharya confirmed this fact to Ayr Energy co-founder Rahul Arora in or around July 2024.

60.     It was at that time when Mr. Arora told Mr. Acharya—also his college friend—that he saw a gap in the transformer supply market and that he planned to enter that market soon.  In response, Mr. Acharya confirmed transformers was not a business line Zetwerk planned to pursue.

61.     Only *after* Mr. Reddy announced his resignation, did Zetwerk change its mind and, in late 2024, decide it wanted to try to broker third-party transformers to clients.

---

[7] Tapas Sarkar, *Zetwerk's Rise from Statrtup to Manufacturing Powerhouse in Just Seven Years*, Clairfield Outlook (2025),  https://www.clairfield.com/wp-content/uploads/2025/03/Buy-build-rise-how-Zetwerk-does-it.pdf.
[8] *Id.*
[9] *Unimacts Glob.*, 2025-79599, D.I. 1 ¶ 22.

62.     But as of mid-2025, Zetwerk still had not broken into the transformer space, as Zetwerk's co-founders confirmed during a recent media interview in which they identified a transformer business line as something Zetwerk is "looking to add."[10]

**C.  Plaintiff Mr. Reddy**

63.     Mr. Reddy began his career in 2012 as an engineer at Eaton, a company specializing in power management solutions.  There, he worked on modeling and simulation of products in the aerospace and hydraulic industries before later working in the company's solar and automative business units.  After three years at Eaton, Mr. Reddy took a position at Ather Energy, an Indian motor vehicle company.  At Aether Energy, Mr. Reddy focused on development, manufacture, and industrialization of lithium-ion batteries for vehicles, and eventually he transitioned to a company-wide leadership role.

64.     In 2019, Mr. Reddy took his years of engineering and manufacturing experience to Zetwerk India, where he became the company's Director of Strategic Initiatives.  In this role, Mr. Reddy was charged with driving the strategic initiatives of Zetwerk India, working closely with Messrs. Ramakkrushnan and Acharya, Zetwerk's co-founders.

65.     In connection with his hiring, Mr. Reddy signed an "Appointment Letter," and an addendum to the Appointment Letter, which he signed on or around January 24, 2020.

66.     The addendum included an overly broad confidentiality provision (§ 2.3) untied to any specific "confidential" or other information.

67.     In or around December 2022, after three years at Zetwerk India and in recognition of his immense contributions to Zetwerk India's business, Mr. Reddy received an offer to become the "Business Head" of Zetwerk US.

68.     As part of this new role, the company asked Mr. Reddy to relocate from India to California, which he did.

69.     In connection with his new role, Mr. Reddy, who was not represented by counsel in negotiating his new role, signed an offer of employment with Zetwerk US on or around December

---

[10] CNBC-TV18, *Young Turks Reloaded | $2Bn in 6 Years | Zetwerk's Startup to Scale-Up Story | CNBC TV18* (YouTube, May 1, 2025), https://www.youtube.com/watch?v=5EriLm-eU40&t=3833s.

26, 2022.  With that offer, Mr. Reddy was presented and signed another contract containing an overly broad confidentiality provision.

70.    Despite Defendants requiring Mr. Reddy to move from India to California for the new role, Defendants included in the offer of employment a provision stating that Delaware law would govern any disputes between Mr. Reddy and Zetwerk US and that any such disputes would be heard in Delaware.[11]

71.    Mr. Reddy excelled in his new role at Zetwerk US.  Given his many successes, Zetwerk foisted many out-of-role responsibilities on Mr. Reddy without defining a new position, providing a formal title, or providing commensurate compensation.

72.    For example, Mr. Reddy was charged with developing a benefits plan for U.S.-based employees and an equities award program for employees in the U.S. and India.  He was also tasked with serving as named director for several Zetwerk subsidiaries outside of India, including Zetwerk US, Unimacts Global, LLC, and Spectrum Elektrotechnik GmbH.

73.    Further, Zetwerk asked Mr. Reddy to hold an undefined and uncompensated temporary leadership role with Unimacts.

74.    This all was in addition to Mr. Reddy's existing responsibilities with Zetwerk US.

75.    Defendants expected Mr. Reddy to perform and deliver for all of these entities although he was not compensated for doing so.

**D.  Mr. Reddy's Resignation from Zetwerk**

76.    In or around August 2024, Mr. Reddy informed Zetwerk's co-founders, Amrit Acharya and Srinath Ramakkrushnan, that he was starting his own company (now known as Ayr Energy) and was resigning.

77.    Mr. Reddy wished to resign immediately but Zetwerk's co-founders implored him to stay with Zetwerk through the end of 2024.  Particularly, Zetwerk's co-founders referenced an imminent initial public offering occurring as soon as early 2025, and they requested that Mr. Reddy continue working for a time to facilitate a smooth transition for the company.  Zetwerk also

---

[11] As set forth below, with this lawsuit, Mr. Reddy seeks to void this forum selection clause pursuant to California Labor Code § 925(b).

1   requested that Mr. Reddy not immediately broadcast his plans to leave the company, instructing

2   him that it could be bad for company morale if employees learned of Mr. Reddy's departure too

3   soon.  Mr. Reddy agreed to each of Zetwerk's requests out of professional courtesy.

4           78.     Shortly thereafter, on September 2, 2024, Unimacts CEO Alan Hays announced his

5   resignation.   In his announcement, Mr. Hays stated that Mr. Reddy would replace him as

6   Unimacts's interim CEO effective immediately.   Mr. Reddy assumed this interim role while

7   working on the effort to find a suitable permanent replacement CEO.  This involved Mr. Reddy

8   personally interviewing CEO candidates with Zetwerk's founders, some of which were in-person

9   interviews.

10          79.     In November 2024, Unimacts hired a new, permanent CEO and Mr. Reddy

11  accompanied him on a trip to India to assist him with the transition.

12          80.     During this trip, Mr. Reddy met with Zetwerk's co-founder Srinath Ramakkrushnan

13  and informed him that he could not remain with Zetwerk US any longer because he needed to focus

14  on his work with his co-founders (whom Messrs. Acharya and Ramakkrushnan knew personally as

15  they were all mutual friends from college) on their new company.  Accordingly, Mr. Reddy  told

16  Mr. Ramakkrushnan that his resignation would be effective no later than December 2024 or January

17  2025.  In this discussion, Mr. Reddy explained how Ayr Energy would operate in the transformer

18  space.  Mr. Ramakkrushnan was initially receptive to Mr. Reddy's plans and only requested that

19  Mr. Reddy not actively recruit Zetwerk employees to leave with him.

20          81.     Mr. Reddy also shared that he was beginning to speak to potential investors

21  regarding Ayr Energy, and requested that Mr. Ramakkrushnan serve as a reference for the investors.

22  Mr. Ramakkrushnan agreed to do so.

23          82.     During November and December 2024, Mr. Reddy spoke to several potential

24  investors, including the venture capital firm Accel.  Accel reported to Mr. Reddy that they had

25  positive conversations with Mr. Ramakkrushnan, which Mr. Ramakkrushnan confirmed to Mr.

26  Reddy by text message as well.

27          83.     That same month, December 2024, Mr. Ramakkrushnan once again asked Mr.

28  Reddy to extend his time at Zetwerk, this time referencing Mr. Reddy's role as a named director of

several Zetwerk subsidiaries, including Zetwerk US.  In an effort to accommodate, Mr. Reddy again agreed.

84.    Throughout December 2024 and into January 2025, Mr. Reddy continued to keep Messrs. Acharya and Ramakkrushnan apprised of the status of Ayr Energy, including its progress and the nature of its business.

85.    By January 9, 2025, Mr. Reddy determined he could not extend his transition any longer, so he informed Defendants that January 15, 2025 would be his final day of employment.

86.    Still, Zetwerk refused to accept Mr. Reddy's departure.  Even after his official last day, Zetwerk continued to insist, over Mr. Reddy's objections, that he sign documents on behalf of the company, including those relating to projects for which Mr. Reddy had no knowledge.

87.    Zetwerk also maintained Mr. Reddy's Zetwerk email and laptop access, including by having him keep his laptop for several months (into March 2025) following his departure. Zetwerk did so to continue to make work-related requests to Mr. Reddy, even though it was no longer paying him.  Zetwerk did not request that Mr. Reddy return his Zetwerk-issued laptop until August 2025—more than six (6) months after his January 2025 departure and four months after filing a lawsuit in India against him for supposed misuse of confidential information.

88.    After January 15, 2025, Mr. Reddy was not compensated for any work performed for Zetwerk US.  Nor was he paid for any work performed for Unimacts, ever.

**E.  Plaintiff Mr. Stuckey**

89.    Mr. Stuckey has nearly two decades of experience working in the energy space, with a focus on the solar energy sector, in which he has held director and executive positions.  For example, Mr. Stuckey served as the Head of North America at Vikram Solar, where he worked prior to joining Unimacts, and in the role of Vice President – Strategic Accounts at GCL Solar Energy, Inc.

90.    Over the course of his decades-long career, Mr. Stucky has developed an extensive network of contacts in the solar energy market.

91.    Mr. Stuckey joined Unimacts in March 2024 as the company's Head of Sales, Solar Modules.

92.    Unimacts hired Mr. Stuckey to help start up their new solar module division, which was to sell solar modules.

93.    In connection with Mr. Stuckey's hiring, Unimacts insisted that Mr. Stuckey, who was not represented by counsel, sign an agreement that included an illegal and overly broad non-compete provision.  Mr. Stuckey objected to the non-compete provision, and Unimacts ultimately admitted that the agreement was unreasonable and, thus, ultimately unenforceable but nonetheless insisted that the provision be included in the employment agreement.

94.    The agreement also contains a provision establishing that, notwithstanding any non-compete or confidentiality provision of the agreement, Mr. Stuckey would retain the right to make use of any "existing relationship with a customer, vendor or supplier that was established before [Mr. Stuckey] joined [Unimacts]" after his employment ended.

**F.  Mr. Stuckey's Resignation from Unimacts**

95.    Soon after starting to work for Unimacts, Mr. Stuckey began to observe that the Unimacts/Zetwerk platform was not suited to his network and skills.

96.    Specifically, most of Mr. Stuckey's contacts were in the United States, where Unimacts/Zetwerk lacked the infrastructure needed to deliver quality solar modules to these potential customers.

97.    This concerned Mr. Stuckey because he was unsure that Unimacts could deliver on the deals he was helping to make with his own long-standing contacts, and Mr. Stuckey did not want to damage his client relationships by over promising and under delivering.

98.    Mr. Stuckey was also concerned because much of his potential compensation was tied to performance-based bonuses that he needed to earn by making sales.  Because Unimacts did not have sufficient infrastructure, he could not make sales, which meant his compensation would be adversely affected.

99.    In late 2024 and into early 2025, it became clear to Mr. Stuckey that many of his contacts had potentially unmet needs for transformers and he thought that this may be an area of demand that Unimacts could meet.

100.    Mr. Stuckey helped Unimacts to make inroads on a small number of potential transformer sales at the end of 2024, only for multiple customers pull out of discussions with Unimacts as they grew concerned about Unimacts's ability to actually deliver given Unimacts's responses to technical inquiries.

101.    Mr. Stuckey thus began to pitch Unimacts and Zetwerk executives on the steps that would be necessary to expand Unimacts's business into the transformer space.  Mr. Stuckey raised these issues over many months in multiple conversations, including directly with Zetwerk co-founder Mr. Ramakkrushnan and the executive leadership team.  But while there was  interest in Mr. Stuckey's ideas generally , there was no specific or even general  action plan identified by Zetwerk, or other affirmative steps taken.

102.    After months of Mr. Stuckey raising these issues without them being acted upon, Mr. Stuckey specifically raised them again with multiple members of the broader Zetwerk executive team at a 30+ person in-person meeting in the United States in or around March 2025, which included one of Zetwerk's founders.  Mr. Stuckey prepared and gave a detailed presentation at the meeting about the opportunities that he believed the transformer market presented and about the infrastructure and partnerships that Unimacts/Zetwerk lacked and needed to build to meet that opportunity.

103.    Mr. Stuckey's presentation was met with a clear acknowledgment that Unimacts/Zetwerk was not currently equipped to meet opportunities in the transformer space but still no action or specific plans to get where it needed to be.  At this point, after months of efforts to educate the Zetwerk team on what was necessary and no follow through, Mr. Stuckey had no confidence that Zetwerk intended to implement a plan or take affirmative steps to build the necessary infrastructure to service a transformer market, and certainly not with any alacrity.

104.    In April 2025, Unimacts still lacked the infrastructure to support transformer sales. Mr. Stuckey, frustrated by the company's lack of sufficient resources and failed to focus its efforts on the opportunities he needed the company to capitalize on, resigned, approximately one year after joining Unimacts, because he felt that there were better opportunities for him in the market than what Unimacts/Zetwerk could offer.

105.    Following his resignation, Mr. Stuckey began to work for Ayr Energy in business development on or about April 7, 2025.

106.    When he departed Unimacts, Mr. Stuckey returned his Unimacts-issued laptop.

**G. Defendants Attempt To Eliminate Ayr Energy Through a Series of Underhanded and Illegal Bully Tactics**

107.    Although Zetwerk's founders were initially supportive of Mr. Reddy and Ayr Energy in late 2024, that shifted in early 2025.

108.    This is when the Ayr Energy's early success on the heels of Mr. Reddy's departure drew the attention of others, including Zetwerk's board.  In January 2025, Mr. Ramakkrushnan explained to Mr. Reddy that people within the company were "flustered" by Mr. Reddy's exit.  Then, things began to escalate as Zetwerk came to see Ayr Energy as a competitor.

109.    Zetwerk could have responded to what it viewed as new competition by doing what everyone else in the market does—focusing the company on innovation, improving the quality of the company's offerings, or prioritizing a different market strategy.

110.    But Zetwerk did not elect to do any of these things.  Instead, as Zetwerk co-founder Srinath Ramakkrushnan admitted to Mr. Reddy, Zetwerk's board and leadership, eager to appease actual and potential investors in advance of its IPO, were determined to do whatever it could to kill competition, and, more specifically, to stop Ayr Energy at all costs.

111.    Accordingly, the Zetwerk executives who, just weeks earlier, had supported Mr. Reddy and provided glowing referrals to potential investors, betrayed Mr. Reddy, and embarked on a calculated, illegal, and anticompetitive crusade to destroy Ayr Energy.

**1.    Zetwerk Sought To Intimidate and Immobilize Mr. Reddy**

112.    First, Zetwerk set out to retaliate against Mr. Reddy for his decision to leave Zetwerk in pursuit of a new venture by withholding payment he is entitled to, threatening to cancel his stock options, and attempting to coerce him into a post-resignation non-compete—a tactic Defendants deployed on a number of prior occasions against other former employees in an effort to prevent those former employees from competing with Zetwerk.

113.    Pursuant to Mr. Reddy's August 7, 2024 email with Mr. Ramakkrushnan, Mr. Reddy was entitled to a $200,000 bonus from Zetwerk  To date, Zetwerk has refused to pay Mr. Reddy his entitled-to bonus.

114.    Specifically, Mr. Reddy was not paid his fiscal year 2025 bonus upon his departure from Zetwerk in January 2025 even though most if not all U.S. employes had received a pro-rated bonus in late 2024.  Instead, upon his departure, Mr. Reddy was told by Mr. Ramakkrushnan that he would receive his bonus after the end of Zetwerk's fiscal year on March 31, 2025.

115.    But Defendants did not pay Mr. Reddy his bonus.  Instead, Defendants leverage Mr. Reddy's substantial unpaid compensation (over $1.5 million in his unpaid bonus and vested stock options) to attempt to force their will on Mr. Reddy.

116.    Initially, they used these payments to coax Mr. Reddy into delaying his formal departure.

117.    Later, after Mr. Reddy's official end date, Defendants leveraged the unpaid compensation to get Mr. Reddy to continue assisting them through the end of the fiscal year, even as he was actively working for Ayr Energy, as Defendants were well aware.

118.    Defendants were also more aggressive, using unpaid compensation (along with the threat of investor interference) to attempt to force Mr. Reddy into a post-resignation non-compete.

119.    For example, on or around January 31, 2025, Mr. Reddy received an email from Mr. Acharya stating that Zetwerk had been hearing from employees and board members that Mr. Reddy was starting a competitive business.  It was simultaneously suggested to Mr. Reddy orally that it would be to his benefit to agree not to compete with Zetwerk.

120.    Mr. Reddy did not agree not to compete with Zetwerk and, instead, responded that he had spoken to Mr. Ramakkrushnan just one day prior, and that Mr. Ramakkrushnan conceded during that discussion Mr. Reddy long had been forthright about his plans for Ayr Energy.

121.    So, thinking the issue to be resolved, Mr. Reddy continued to communicate with the Zetwerk co-founders, and sign certain documents at their request on behalf of Zetwerk, hopeful that his continued accommodations would be appreciated and that he would be paid his overdue compensation.

122.    But despite Mr. Reddy's work to accommodate Zetwerk, he saw no signs that his compensation actually would be paid, even as seemingly everyone else in the U.S. received their bonuses.  Meanwhile, Mr. Reddy continued to hear that Zetwerk was concerned about his new business.

123.    Finally, Mr. Reddy realized he needed to protect himself and, specifically, that he needed to sufficiently document issues relating to his unpaid compensation and Zetwerk's claims that his new company may be unlawfully competing with Zetwerk.  Accordingly, in addition to documents downloaded in the ordinary course of business, he downloaded documents related to negotiation of his bonus and his performance, including non-confidential discussions between Mr. Reddy and Zetwerk employees regarding his bonus, documents outlining his bonus structure and compensation, positive reviews from employees who worked under him, and documents relating to his departure.

124.    As the tension between Defendants and Mr. Reddy increased, Mr. Reddy met with Mr. Ramakkrushnan in March 2025 to discuss these issues in Bangalore, India.

125.    During the meeting, Mr. Ramakkrushnan, once again, acknowledged that Mr. Reddy had openly communicated his plans to leave Zetwerk and start Ayr Energy in advance of his departure.

126.    Nonetheless, Mr. Ramakkrushnan threatened Mr. Reddy with a lawsuit that he conceded would have no "legs to stand on" and would drag on only to eventually "die a natural death."

127.    Further compounding the bonus dispute, during this meeting, Mr. Ramakkrushnan also threatened to cancel Mr. Reddy's Employee Stock Option Agreement, without any articulated basis for doing so.

128.    When Mr. Reddy asked how the relationship devolved, Mr. Ramakkrushnan blamed it on timing and suggested the company needed to take an aggressive stance on potential competition.  For that reason, Mr. Ramakkrushnan asked Mr. Reddy to agree not to work on transformers for a year so that KRYFS—a company that Zetwerk intended to but had not yet acquired—could do so.

19

129.    When Mr. Reddy refused, Mr. Ramakkrushnan proposed a post-resignation non-compete in IDTs, a specific type of transformer, for five years.

130.    When Mr. Reddy pushed back and noted that Zetwerk had not sold a single IDT in the U.S. market and it therefore made no sense that he could not sell them, Mr. Ramakkrushnan only responded that his investors, apparently unfamiliar with the transformer market, did not understand this nuance.

131.    Mr. Reddy refused to agree to this arbitrary and anti-competitive restraint too.

### 2.    Zetwerk Makes Defamatory Attempts To Interfere with Ayr Energy's Funding

132.    Around the same time, Defendants targeted Ayr Energy's potential funding, and specifically tried to prevent Accel and General Catalyst, venture capital firms, from investing in Ayr Energy—once again drawing on a tactic deployed against former Zetwerk employees in the past.

133.    Zetwerk co-founder Srinath Ramakkrushnan, who had previously served as a reference in connection with potential Accel financing of Ayr Energy a few months earlier, reached out to Accel to rescind his previous positive statements about Mr. Reddy and told Accel that Ayr Energy was a competitor to Zetwerk.  Mr. Ramakkrushnan also reached out to General Catalyst with similar comments.

134.    At Accel's behest, Mr. Reddy met with Mr. Ramakkrushnan in March 2025, in Bangalore, India, in part, to resolve their differences.

135.    As discussed *supra*, Mr. Ramakkrushnan spent the majority of the meeting threatening Mr. Reddy with an admittedly meritless lawsuit and cancellation of his stock options. He also attempted to coerce him into an illogical and unsupported non-compete with KRYFS, a company Zetwerk intended to but had not yet acquired.

136.    Mr. Reddy responded to these threats by attempting diplomacy.  Rather than suggest some sort of non-compete as Mr. Ramakkrushnan had, Mr. Reddy proposed that Ayr Energy could partner with KRYFS to purchase supplies from the company.  Mr. Reddy followed up on this offer via email to Mr. Ramakkrushnan.

137.     In Mr. Ramakkrushnan's email response, on which he **copied Ayr's potential investors at Accel**, Mr. Ramakkrushnan maligned Mr. Reddy, made false and unfounded allegations about Mr. Reddy's departure from Zetwerk, and threatened legal action.

138.     Mr. Reddy responded to dispute Mr. Ramakkrushnan's allegations and reminded him of the time and energy that he invested into Zetwerk, including his willingness to accommodate Zetwerk's repeated requests to extend his term.  Mr. Reddy refuted any basis for legal action and reminded Mr. Ramakkrushnan that Mr. Ramakkrushnan had conceded a lawsuit would be baseless during their in-person discussion.

139.     Mr. Ramakkrushnan did not deny Mr. Reddy's statement that any legal action on behalf of Zetwerk against Mr. Reddy would lack merit (because it would).  Nor did he respond to Mr. Reddy's recitation of their meeting or whether Zetwerk's actions were undertaken to appease its board and investors.  Instead, Mr. Ramakkrushnan curtly referenced an internal investigation, with no specifics or support for his baseless allegations, and explained that investors made their own decisions.

140.     Then, on April 17, 2025, in a further effort to kill Ayr Energy's potential funding, Zetwerk's General Counsel, John Thaliath, sent an email to third parties, including Accel and General Catalyst (which had already invested in Ayr Energy and which had no relationship with Zetwerk).  Mr. Thaliath's email alleged, without evidence, that Mr. Reddy and Ayr Energy possessed Zetwerk's "confidential and proprietary trade secrets."

141.     In the same email, Mr. Thaliath described Mr. Reddy—who had graciously accommodated the lengthy and ever-expanding transition that Defendants requested—as "dishonest."   He also alleged (again, without evidence) "anomalies" with Ayr Energy's information, including that "the manufacturing locations published seem to be non-existent or PO Box numbers."

142.     Mr. Thaliath further accused Mr. Reddy of having "misinformed" Zetwerk about Ayr Energy, breaching his contract with Zetwerk, and improperly soliciting Zetwerk's employees, customers, suppliers, and investors.

143.    Mr. Thaliath went on to tell investors that Zetwerk intended to "pursue all necessary measures," and that "[Zetwerk's] legal measures include adversarial proceedings against AYR Energy, Andiruddh [sic] Reddy and the other individuals involved, in India and the United States."

144.    These allegations irreparably harmed Ayr Energy and Mr. Reddy.  The unfounded allegations damages their reputations, and shortly after, Accel informed Ayr Energy that it did not feel comfortable proceeding with funding given Defendants' accusations against Ayr Energy and Mr. Reddy.

### 3.    Defendants Filed a Baseless, Pretextual Suit in India

145.    Defendants also brought their fight to the legal arena, ultimately following through on their threats and filing multiple (baseless) legal actions.

146.    First, on April 3, 2025, Zetwerk India filed a lawsuit against Mr. Reddy (ignoring that he resides in California) and, for some reason, its own subsidiary, Zetwerk US.  Zetwerk India then withdrew the lawsuit two weeks later on April 17, and re-filed on April 23 with certain factual allegations omitted.  Notably, while Zetwerk India named its own subsidiary, Zetwerk US, as a defendant in both lawsuits, neither named Ayr Energy.

147.    In the India lawsuit, Zetwerk alleges that Mr. Reddy (1) misappropriated Zetwerk India's information in violation of a confidentiality provision that is overly broad such that it is a *de facto* non-compete and (2) sought to procure the services of a Zetwerk supplier.

148.    Zetwerk India's action conveniently omits any identification of "confidential information" and the circumstances surrounding how or why Mr. Reddy possessed that information.

149.    As Defendants are well aware, the only documents Mr. Reddy downloaded were either downloaded while he worked for Zetwerk and in connection with and for use in his employment, or were related to the ongoing disputes.

150.    This conduct is what Defendants have latched onto as a pretext to claim "misappropriation."

151.    In an effort to paint innocuous and routine actions as "misappropriation," Defendants also asserted that Mr. Reddy deleted unspecified information weeks prior to leaving

1  Zetwerk.  But Mr. Reddy merely sought to remove his personal information (*e.g.*, documents

2  containing his social security number, passport information, and other personal files) from his

3  Zetwerk laptop.  That is not nefarious.  It is routine pre-departure activity.

4       152.   Of course, Defendants have a complete audit trail of all documents downloaded

5  from Zetwerk systems to Mr. Reddy's Zetwerk laptop.  They know what the documents are, how

6  they were used, and when they were downloaded.  But Zetwerk India omitted these specifics from

7  its India lawsuit because they are unfavorable to them.  The specifics confirm that Mr. Reddy did

8  not "misappropriate" "trade secrets"; instead, the specifics confirm that Mr. Reddy downloaded

9  materials relevant to his ongoing disputes.

10      **4.    Defendants Use the India Lawsuit To Try To Fish into Ayr Energy**

11      153.   Since Zetwerk India filed suit in India, Defendants have made no effort to

12  substantiate their claims.  That is because they never intended to litigate that case on the merits.

13      154.   Instead, Defendants attempted to leverage the foreign lawsuit into a fishing

14  expedition into Ayr Energy's business operations, with the hope that they could find discovery to

15  use against Ayr Energy.

16      155.   Shortly after filing the India action, Zetwerk India initiated an action pursuant to 28

17  U.S.C. § 1782 in Delaware, requesting discovery from Ayr Energy. [12]

18      156.   Zetwerk India's requests to Ayr Energy were overly broad.[13]  Putting the lie to any

19  claim that Zetwerk India filed the action in good faith to aid a foreign litigation, the requests

20  targeted various documents that could be obtained from Zetwerk itself or Mr. Reddy (a party to the

21  foreign action).[14]  More critically, taken together, the requests seemed to target nearly every

22  document in Ayr Energy's possession.[15]

23

24

25

---

26  [12] *In re: Appl. of Zetwerk India Mfg. Bus. Pvt. Ltd.*, No. 1:25-cv-00567, ECF No. 1 (D. Del. May 7, 2025).

27  [13] *See, e.g.*, *id.* at 6–7.

28  [14] *See id.*
    [15] *See id.*

157.    Zetwerk India represented to the Delaware federal court that there was no need for "concern that the documents were sought for a fishing expedition against Ayr Energy."[16]  Instead, it argued that "[t]he discovery sought here seeks to identify the scope of the theft and materials that Petitioner [sic] may have provided to [Ayr Energy]."[17]  But in July 2025, Zetwerk confoundingly claimed point blank as part of the meet-and-confer process in Delaware that it had no idea what, if anything, Mr. Reddy took from Zetwerk at all.[18]  That is, months after Zetwerk's general counsel Mr. Thaliath informed Ayr's potential and actual investors that Mr. Reddy was "in possession of proprietary information and market intelligence (which are confidential and proprietary trade secrets) belonging to Zetwerk," and months after Zetwerk India filed suit against Mr. Reddy in India alleging misuse of confidential information, Zetwerk finally admitted the truth: it had no basis to make those statements and claims.

158.    The Delaware court recognized the deficiencies in Zetwerk India's petition and denied it entirely, including because "Zetwerk provide[d] no justification for seeking broad discovery from Ayr on 'all documents' and 'all communications,'" which was "overbroad and would therefore impose an undue burden on Ayr."[19]

### 5.    Defendants Forum Shop and Sue in Texas

159.    Unsuccessful in their fishing expedition but undeterred from their anticompetitive campaign, Defendants escalated their improper conduct.  After Zetwerk India's attempts to obtain sweeping discovery into Ayr Energy's business were denied in Delaware, Defendants filed a lawsuit in Texas state court against Ayr Energy.[20]

---

[16] *In re: Appl. of Zetwerk India Mfg. Bus. Pvt. Ltd.*, No. 1:25-cv-00567, ECF No. 27-1 at 3 (D. Del. July 16, 2025) (July 14, 2024 email from G. Zeballos to C. Sama).
[17] *In re: Appl. of Zetwerk India Mfg. Bus. Pvt. Ltd.*, No. 1:25-cv-00567, ECF No. 3 at 1 (D. Del. May 7, 2025).
[18] Indeed, Zetwerk cited this as a reason it could not narrow its impermissibly broad subpoena requests.  *In re: Appl. of Zetwerk India Mfg. Bus. Pvt. Ltd.*, No. 1:25-cv-00567, ECF No. 27-1 at 2–3 (D. Del. July 16, 2025) (July 14, 2024 email from G. Zeballos to C. Sama) ("We cannot narrow our requests beyond categorical descriptions without knowledge of what Mr. Edla improperly took from Zetwerk.").
[19] *In re: Appl. of Zetwerk India Mfg. Bus. Pvt. Ltd.*, No. 1:25-cv-00567, ECF No. 28 at 8, 11 (D. Del. Aug. 13, 2025).
[20] *Unimacts Glob.*, 2025-79599, D.I. 1 .

160.    The complaint focuses on Mr. Reddy's actions above and on those of Mr. Stuckey, whom Defendants accuse of misappropriating trade secrets.[21]   Defendants named neither Mr. Reddy nor Mr. Stuckey as defendant, though.[22]  Instead, they sued Ayr Energy alone, asserting that the company directed Mr. Reddy and Mr. Stuckey's misappropriation.[23]

161.    But the Texas court lacks personal jurisdiction over Ayr Energy, which is incorporated in Delaware and has its principal place of business in California.  None of the conduct at issue occurred in Texas.

162.    Accordingly, Ayr Energy has filed a special appearance with the Texas court in order to oppose jurisdiction.  In response, Defendants amended their complaint to the Texas court with allegations that are not relevant to establishing jurisdiction (such as identifying nationwide customers and suggesting that they operate only in Texas) and tried to adopt the strategy it used in Delaware by asking for "expedited" discovery (despite not having sought expedited discovery in its initial complaint more than a month earlier).

163.    The allegations in the Texas lawsuit also are substantively meritless.

164.    The activity discussed above forms the bases of Defendants' claims regarding Mr. Reddy.  As detailed above, Mr. Reddy did not "misappropriate" any "trade secrets."

165.    Neither did Mr. Stuckey.  Defendants claim Mr. Stuckey retained confidential information, including relating to actual and potential customers, but omit that Mr. Stuckey never downloaded any documents outside of the course of his ordinary work for Unimacts.[24]  Defendants do not allege (because they cannot allege) that Mr. Stuckey transferred anything from his Unimacts laptop.

166.    And even if documents had been downloaded outside of the normal course (and they were not), Defendants repeatedly have failed to explain how anything downloaded possibly could qualify as a "trade secret."  That is because they are not "trade secrets."  So, Defendants have tried to vaguely assert that Mr. Reddy and Mr. Stuckey had access to certain information, without

---

[21] *Id.* ¶ 64.
[22] *Id.* ¶¶ 7–10.
[23] *Id.* ¶ 64.
[24] *See Unimacts Glob.*, 2025-79599, D.I. 1  ¶¶ 66–67.

attempting to tie that information to specific documents, on topics such as "customers."  But Defendants broadcast information about their customers publicly, including on their own websites,[25] and information about potential customers also is widely known given that the potential customers are large solar developers, of which there are not many and who are publicly known.[26] The other information Defendants generally contend is at issue (without ever trying to tie specific information to any documents allegedly downloaded) is similarly general, vague, and known. Defendants know this so they have made an active effort to avoid these critical, case-killing details.

167.    Furthermore, Defendants are attempting to restrain Mr. Reddy and Mr. Stuckey with vague, overbroad, and unenforceable confidentiality provisions and to restrain Mr. Stuckey with a vague, overbroad, and entirely unreasonable non-compete provision.  That non-compete clause purports to restrict Mr. Stuckey from engaging ***anywhere in the world*** for a period of two years, directly or indirectly, "in any business that competes or intends to compete with any activity" in which Unimacts has engaged or has any plans to engage in.  The provision is unreasonable on its face, and does not articulate or define Unimacts's business activity with any specificity.  Defendants cannot use this provision, which far exceeds any legitimate economic interest of Unimacts, to restrain Mr. Stuckey in his employment.

168.    The truth is that Defendants are trying to use the Texas action to fish and obtain a judicially ordered non-compete against Ayr Energy.  Defendants have no right to this.

### 6.    Defendants Utilized the Media To Further Defame and Malign Plaintiffs

169.    Seeking to maximize the impact of their attacks, shortly after filing their Texas lawsuit, Defendants took to the press.

170.    After filing their lawsuit in Texas, in October 2025, Defendants, on information and belief, contacted The Economic Times, an Indian news outlet that never even reported on the litigation that was actually filed in India in April 2025, and fed it a story about the litigation,

---

[25] Zetwerk, https://www.zetwerk.com/en-us/ (last visited Dec. 1, 2025).
[26] *See, e.g.*, *2025 Top Solar Developers*, Solar Power World, https://www.solarpowerworldonline.com/2025-top-solar-developers/ (listing the top solar developers).

trumpeting their claims against Ayr Energy as if they were already proven, and falsely defaming Plaintiffs.

171.    The Economic Times published a story about the litigation,[27] which other news outlets picked up and shared.  Additional news stories followed.[28]

172.    These stories began to come out right after Accel had renewed discussions with Ayr Energy about providing additional funding.  And, once again, Defendants interfered with that relationship and others—irreparable harming Ayr Energy.

173.    On the heels of these stories, Accel soon informed Mr. Reddy that it did not feel comfortable moving forward with Ayr Energy given the negative media attention surrounding the company's lawsuit in Texas.

174.    Two other potential investors similarly stated that they did not feel comfortable moving forward for the same reason.

175.    Finally, three potential customers poised to give over **$60,000,000** in business to Ayr Energy cited the lawsuit and ensuing media attention as concerns and then terminated contract discussions.  One such customer backed out of a **$40,000,000** contract with Ayr Energy due to Zetwerk's false media campaign.

176.    Around the same time, additional potential customers backed out of deals with Ayr Energy.  On information and belief, these entities were motivated to pull out of discussions with Ayr Energy because of Zetwerk's defamation.

177.    Accordingly, on information and belief, Defendants' defamatory smear campaign damaged Ayr Energy at least in excess of $100,000,000.

---

[27] Ajay Rag, *Zetwerk Sues Ayr Energy Over Alleged Misuse of Confidential Data; Seeks $100 Million in Damages*, The Economic Times (Oct. 28, 2025 4:37:38 PM IST), https://economictimes.indiatimes.com/markets/digital-real-estate/realty-news/building-the-future-one-digital-square-foot-at-a-time/articleshow/125152975.cms.

[28] *See, e.g.*, Bhupendra Paintola, *From Insider To Rival: Zetwerk Sues Ayr Energy Over Alleged Data Misuse*, Inc42 (Oct. 28, 2025), https://inc42.com/buzz/from-insider-to-rival-zetwerk-sues-ayr-energy-over-alleged-confidential-data-misuse/; Shashank Pathak, *Zetwerk Drags Ayr Energy to US Court Over Alleged Data and Trade Secret Violations*, EnTrackr (Oct. 28, 2025), https://entrackr.com/news/zetwerk-drags-ayr-energy-to-us-court-over-alleged-data-and-trade-secret-violations-10599304.

178.    In addition to this monetary harm, loss of potential funding and loss of potential contracts at this critical juncture in Ayr Energy's history, this abusive and illegal conduct irreparably harmed Ayr Energy, affecting its reputation and long-term market share immeasurably.

### 7.    Defendants Engaged in False and Misleading Advertising

179.    Defendants' underhanded tactics did not end there.

180.    Apparently realizing that its defamation and interference with Ayr Energy's investor relationships could not stop Ayr Energy's organic and hard-earned growth, Defendants turned their attention to competing for customers.

181.    Defendants began making misrepresentations about their own offerings and capabilities to mislead customers and steal unearned market share.

182.    First, Defendants have falsely and misleadingly advertised their capabilities and experience in developing custom-made transformers.

183.    Recall that Zetwerk historically did not design its own transformers, something Ayr Energy has done since its inception.  Rather, Zetwerk's business model focused on delivering third-party products to consumers.  To this point, Defendants did not post on their LinkedIn accounts about transformers until just a few month ago, in or around August and September 2025.[29]

184.    This puts the lie to any claim that Defendants have "trade secrets" relating to a (non-existent) custom transformer business during Mr. Reddy's time at the company.

185.    Although Defendants lacked experience (and certainly "expertise") in the custom transformer space, they saw Ayr Energy capitalizing on its ability to design and deliver custom transformers, and Defendants were desperate to create a facade of innovation and high value in advance of the forthcoming IPO.  So, Defendants decided to try their hand at designing custom transformers.  To pump up the perceived value of this business and deceive customers into trusting them with their custom transformer needs, Defendants embarked on a "fake it 'til you make it"

---

[29] *See, e.g.*, Unimacts Global, LinkedIn, (2025) https://www.linkedin.com/posts/unimacts-global_replus25-solar-unimacts-activity-7357054789169397760-G7sk?utm_source=share&utm_medium=member_desktop&rcm=ACoAABWUKJ4BOC4z6lZOCvLMUsR8l2tYuLprEOQ.

false advertising campaign to falsely and misleadingly suggest to the market that it had a robust custom transformer business and related experience, even though it did not.

186.    Defendants decided to enter the customer transformer space in late 2024 and they received their first order for a custom transformer in December 2024.

187.    Because these transformers can take anywhere from 60–80 weeks to develop (on the quicker side), on information and belief, Defendants have not yet delivered any custom-made transformers.

188.    Nonetheless, in or after August 2025, Defendants revamped their websites and marketing materials to falsely and misleadingly suggest expansive, decades-long experience building and delivering high quality, custom-made transformers—often through statements that contain factual and technical inaccuracies, and which therefore confirm Defendants' lack of experience and knowledge with transformers.[30]  Defendants began to focus their materials on transformers while simultaneously de-emphasizing discussion of their actual business experience in delivering third-party products in the same materials.

189.    For example, Defendants claim that they "deliver complete transformer solutions through Unimacts, powered by KRYFS' 40-year legacy in core and tank manufacturing."[31]  This suggests that KRYFS (which Unimacts partners with) has 40 years of experience "deliver[ing] complete transformer solutions."[32]  That is not true.  To begin, KRYFS does not have 40 years of experience in anything.  The company was founded in 1991.[33]  And KRYFS does not traditionally make transformers.  Instead, historically, it provided parts to others who then used them to build transformers.  Further, the transformers that KRYFS makes now are different from those described on Zetwerk's website.  KRYFS develops distribution class, medium-voltage transformers, not the

---

[30] *Powering Industries with Reliable Transformers,* Unimacts, https://www.unimacts.com/transformers/ (last visited Dec. 1, 2025).

[31] *Zetwerk Transformers*, Zetwerk, https://www.zetwerk.com/en-us/capabilities/transformers/ (last visited Dec. 1, 2025).

[32] *Id.*

[33] KRYFS – Hamesha Kaizen: About, LinkedIn, https://www.linkedin.com/company/kryfs/about/ (last visited Dec. 1, 2025) ("KRYFS Technologies Pvt. Ltd. is a leading name in the field of electrical steel processing and transformer manufacturing in India. Established in 1991, we are committed to delivering high-quality solutions that power the nation and drive progress.").

high-voltage power transformers advertised on Zetwerk's site.  Moreover, these transformers are a relatively small subset of KRYFS's business, which is focused on CRGO laminations, a raw material for transformers.

190.    Defendants also boast that they offer pad-mount transformers that meet IS and IEC standards.[34]  This is obviously incorrect, for at least two reasons.  First, because Defendants have no experience designing such pad-mount transformers.  Second, and seemingly confirming Defendants' lack of experience, pad-mount transformers are never designed in the U.S. for IS or IEC standards; the U.S. follows IEEE standards, and pad-mount transformers are defined only in IEEE C57.12.34.  This same webpage contains misstatements about Dry Type, Extra High Voltage, Power, and Cast Resin transformers—all of which reveal that Zetwerk is trying to fabricate experience and expertise where it has none.

191.    The Zetwerk Defendants have further misrepresented their experience building and delivering custom transformers by making statements such as the following:

    a.  "Zetwerk's transformer facilities are equipped with advanced machinery and digital quality systems that guarantee consistency across every unit produced."[35]

    b.  "Zetwerk delivers end-to-end electrical transformer solutions for industrial, utility, and renewable projects.  With in-house design, CRGO core processing, winding, and testing capabilities, Zetwerk ensures high efficiency, IEC compliance, and faster project timelines for both domestic and export markets."[36]

---

[34] *Powering Industries with Reliable Transformers,* Unimacts, https://www.unimacts.com/transformers/ (last visited Dec. 1, 2025).

[35] Anupreethi M., *From Design to Performance: Building Reliable Potential Transformers with Zetwerk*, Zetwerk, https://www.zetwerk.com/en-us/resources/knowledge-base/transformers/from-design-to-performance-building-reliable-potential-transformers-with-zetwerk/ (last visited Dec. 1, 2025).

[36] Anupreethi M. *Leading Electrical Transformer Manufacturers In India*, Zetwerk, https://www.zetwerk.com/en-us/resources/knowledge-base/transformers/leading-electrical-transformer-manufacturers-in-india/ (last visited Dec. 1, 2025).

c.  "Zetwerk stands out as a trusted custom transformer manufacturer supporting EPCs with precision-built, type-tested transformers tailored for every project's technical and environmental requirements."[37]

d.  "Unimacts provides transformers designed for consistent performance, efficiency, and durability across diverse applications."

e.  "From core engineering to final assembly, Zetwerk delivers type-tested transformers built for reliability, efficiency, and long-term grid performance."[38]

192.    All of these statements falsely and misleadingly suggest experience actually delivering custom transformers that Defendants do not have.

193.    The Zetwerk Defendants have compounded these misrepresentations by claiming specific, misleading, and verifiably false statistics for its nascent custom transformer business.  For instance, in the promotional content from October 2025 shown below, Defendants purport to detail Unimacts's lead times for various, custom-made transformers and claim that Unimacts outperforms industry average lead times.  These statements are false and misleading.  Because Unimacts received its first custom-made transformer order in December 2024 and likely has not delivered any yet, it is misleading to report a "lead time" at all, much less a lead time of 60 weeks when as of October 2025, 60 weeks had not even passed since Unimacts received its first order in December 2024.

---

[37] Ritesh Kumar, *Why Leading EPCs Prefer Custom Transformer Manufacturers in India*, Zetwerk, https://www.zetwerk.com/en-us/resources/knowledge-base/transformers/why-leading-epcs-prefer-custom-transformer-manufacturers-in-india/ (last visited Dec. 1, 2025).
[38] *Zetwerk Transformers*, Zetwerk, https://www.zetwerk.com/en-us/capabilities/transformers/ (last visited Dec. 1, 2025).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**Unimacts Global**
6,873 followers
1w • 🌐

Setting a New Benchmark in Transformer Lead Times:

At Unimacts, we understand that in the transformer industry, every week of lead time matters.
 Through our strategic manufacturing network and optimized global supply chain, we're redefining delivery excellence — helping customers move faster, smarter, and more efficiently.

Across transformer categories, our lead times consistently outperform industry averages:

-Power Transformers: 60 weeks vs. 120 weeks (industry average)
-Distribution Transformers: 20 weeks vs. 40 weeks(industry average)
-Dry-Type Transformers: 24 weeks vs. 40 weeks(industry average)
-Inverter Duty: 28 weeks vs. 44 weeks(industry average)
-Pad-Mounted: 30 weeks vs. 48 weeks(industry average)

With efficient planning, strong partner networks, and local warehousing, we deliver precision-built transformers faster — without compromising on quality or performance.

At Unimacts, delivery excellence isn't a goal — it's our standard.

Connect with us to learn how Unimacts can help reduce lead times and enhance your transformer supply chain: http://bit.ly/3Lcn66M

#TransformerManufacturing #PowerTransformers #DistributionTransformers #DryTypeTransformers #ElectricalEquipment #GridInfrastructure #TransmissionAndDistribution #PowerDistribution #EnergyInfrastructure #TransformerSolutions

[39]

194.    The other statistics Defendants provide on their lead times for transformers are similarly false and misleading.

195.    On information and belief, these uncited, unsupported statements about industry average lead times are cherrypicked to misleadingly suggest that Unimacts's performance is better than it is.

196.    These statements are exemplary.  A number of Defendants' other marketing materials contain additional false and misleading statements made by Defendants that suggest they have far more success and experience delivering custom-made transformers than they actually do.

---

[39] Unimacts Global, LinkedIn, https://www.linkedin.com/posts/unimacts-global_transformermanufacturing-powertransformers-activity-7388547776634085377-HJRk/ (last visited Dec. 1, 2025).

Attached as Exhibit 1 is a compilation of Defendants' marketing materials containing false and misleading statements that have been annotated with a red box to identify false and misleading statements.

197.    Defendants also misrepresent the quality of both their inspection process and ultimate deliverables.

198.    They claim that "Zetwerk Quality Control" "ensures that **every production part** is inspected and meets requirements."[40]  That is false.  On a separate page of the Zetwerk website—which the advertising-at-issue does not reference or link to—Defendants explains that "Zetwerk Quality Control" refers to Defendants employing a "team of quality assurance specialists" who "oversee" a process but who do not inspect every part, but this is not clear on the face of the misleading advertisement.[41]

199.    Defendants also misrepresent in the next sentence that the process they employ "ensures zero quality escapes" and "no rejections at the customer end."[42]  The claims that there have been "zero" quality escapes and "no" rejections are specific and verifiable, and they are false.  There have been repeated complaints about the quality of Defendants' products and numerous customer rejections.[43]

200.    Defendants' false and misleading statements are made across multiple platforms, including on their websites, marketing materials, and social media pages.  Importantly, a number of these false and misleading are proximate to the option on Zetwerk's website (zetwerk.com) to

---

[40] *Zetwerk*, Zetwerk, https://www.zetwerk.com/en-us/ (last visited Dec. 1, 2025).

[41] *Zetwerk Quality Control*, Zetwerk, https://www.zetwerk.com/en-us/manufacturing-services/quality-control/ (last visited Dec. 1, 2025).

[42] *Top Die Casting Manufacturers In The USA*, Zetwerk, https://www.zetwerk.com/en-us/resources/knowledge-base/die-casting/top-die-cast-manufacturers-in-the-usa/ (last visited Dec. 1, 2025).

[43] Indeed, the problems appear so pervasive that Zetwerk has a job listing for an "Associate Manager" for "Quality" that includes "[h]andle customer complaints" as a lead responsibility. Zet Town India Pvt. Ltd., *Associate Manage – Quality*, SenseHQ, https://zetwerk.sensehq.com/careers/jobs/55155 (last visited Dec. 1, 2025).

"Get a Quote," which is omnipresent throughout the website's many pages, and the option to engage with a "member of the sales team" by online chat.[44]

201.    Defendants' false and misleading statements are material and highly deceptive to customers, who base their decision-making on some of the very factors Defendants are untruthful about: experience, lead time, delivery speed, and quality.

202.    Defendants' false and misleading statements also harm Ayr Energy, an emerging leader in power equipment.  Defendants compete with Ayr Energy in the market, and as a result of Defendants' misrepresentations, customer relationships and sales have been diverted away, causing Ayr Energy monetary and immeasurable, irreparable harm during the company's formative time.

*          *          *

203.    At bottom, rather than compete fairly in the market on the merits (or innovate to try), Defendants have instead gone to extreme, deceptive, coercive, abusive, and improper lengths to try to stomp Ayr Energy out of existence.

204.    Defendants' bullying has harmed Plaintiffs significantly and irreparably.

205.    Ayr Energy's business is hard-earned and it benefits consumers.  This is why Plaintiffs filed this lawsuit: to protect Ayr Energy's hard-earned position, to continue shattering industry norms, to ensure that customers are treated rightly and fairly, and to stop Defendants' tyranny.

### **FIRST CLAIM FOR RELIEF**

### **(on behalf of Ayr Energy against all Defendants)**

### **(False Advertising & Unfair Competition, 15 U.S.C. § 1125(a))**

206.    Plaintiff Ayr Energy realleges and incorporates by reference herein each and every allegation set forth above.

207.    Defendants have made in interstate commerce and continue to make in interstate commerce false and misleading statements of fact in commercial advertising and promotion, regarding the nature of their business, which competes with Ayr Energy's business.

---

[44] *See, e.g.*, *Zetwerk's Manufacturing Capabilities*, Zetwerk, https://www.zetwerk.com/en-us/capabilities/ (last visited Dec. 1, 2025); *Zetwerk For Manufacturers*, Zetwerk, https://www.zetwerk.com/en-us/industries/ (last visited Dec. 1, 2025).

34

208.    As detailed above, Defendants have made false and misleading statements regarding their business and specifically the quality of their offerings, their delivery speed and lead-times, and experience with custom-made transformers.

209.    Defendants' statements constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B) and § 43(a) of the Lanham Act because they are false and misleading.

210.    Defendants' misleading misrepresentations are material in that they are likely to influence consumers' purchasing decisions, including because they concern characteristics and qualities material to customer decision-making, and because they are made proximate to the point of sale, including on the Zetwerk website proximate to Defendants' "Get A Quote" button.

211.    On information belief, Defendants are making similar misrepresentations directly to consumers to drive Defendants' sales.

212.    Defendants' false and/or misleading statements have the tendency to deceive a substantial segment of its audience and, on information and belief, have actually deceived a substantial segment of its audience.

213.    The false and/or misleading statements above have injured and are likely to further injure Ayr Energy because Ayr Energy directly competes with Defendants in the transformer market.  So, in deceiving users into purchasing transformers from Defendants, Defendants have depressed demand for Ayr Energy's offerings, leading Ayr Energy to lose business and directly affecting Ayr Energy's revenue.

214.    The statements have, therefore, also harmed and continue to harm Ayr Energy's business relationships and goodwill with its actual and potential customers, as they make these customers less likely to use Ayr Energy's offerings.

215.    As a result, Ayr Energy has been injured as a direct and proximate result of the wrongful acts of Defendants alleged above.

216.    Ayr Energy has suffered, and will continue to suffer, substantial damage to its business reputation, and goodwill, for which Ayr Energy has no remedy at law.

217.    Defendants' false advertising will continue to harm Ayr Energy, causing irreparable injury, including unquantifiable damages to Ayr Energy including but not limited to loss of

35

1    customers, loss of short-term and long-term market share, and damage to the goodwill associated

2    with Ayr Energy's business, for which there is no adequate remedy at law, unless permanently

3    enjoined by this Court.

4        218.    Based on the foregoing, Ayr Energy is entitled to enhanced monetary damages of

5    up to three times the amount of Ayr Energy's actual damages and/or Defendants' profits resulting

6    from Defendants' false advertising, in an amount to be proven at trial, and the costs of the action,

7    pursuant to 15 U.S.C. § 1117.  Ayr Energy also is entitled to an accounting of Defendants' profits

8    resulting from its Lanham Act violations.

9        219.    Defendants' false advertising—including their statements to the media regarding

10   Ayr Energy—is willful, knowing, calculated to deceive, and was undertaken in bad faith.  As a

11   result, this Court should determine that this is an exceptional case and award Ayr Energy its

12   attorneys' fees and costs incurred in prosecuting this action pursuant to 15 U.S.C. § 1117.

13   **<u>SECOND CLAIM FOR RELIEF</u>**

14   **<u>(on behalf of Ayr Energy against all Defendants)</u>**

15   **<u>(False Advertisement Under Cal. Bus. & Prof. Code § 17500 *et seq.*))</u>**

16       220.    Plaintiff Ayr Energy realleges and incorporates by reference herein each and every

17   allegation set forth above.

18       221.    As outlined above, Defendants are "persons" within the meaning of the California's

19   Unfair Competition Law ("UCL").

20       222.    Defendants' acts are "unlawful" within the meaning of the UCL, including based on

21   the false and misleading statements discussed at length above.  Defendants have made—and are

22   continuing to make—untrue and misleading express and implied representations regarding their

23   capabilities.

24       223.    In making these representations, Defendants knew, or by the exercise of reasonable

25   care should have known, that these statements were untrue or misleading and so acted in violation

26   of UCL § 17500 *et seq.*

27       224.    Ayr Energy has suffered, and will continue to suffer, substantial damage to its

28   business reputation, goodwill, and market share, for which Ayr Energy has no remedy at law.

Defendants' false advertising will continue to harm Ayr Energy, causing irreparable injury, including unquantifiable damages to Ayr Energy including but not limited to loss of users, loss of short-term and long-term market share, and damages to the goodwill associated with Ayr Energy's business, for which there is no adequate remedy at law, unless permanently enjoined by this Court.

**THIRD CLAIM FOR RELIEF**

**(on behalf of all Plaintiffs against all Defendants)**

**(Trade Libel Under California Common Law)**

225.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth above.

226.    As recited above, Defendants made untrue statements that disparaged Ayr Energy and Mr. Reddy to Accel, an investor in Zetwerk and potential investor in Ayr Energy, and to General Catalyst.  Defendants also made untrue statements that disparaged all Plaintiffs to the media.

227.    Defendants knew that the statements were untrue or acted with reckless disregard of the truth or falsity of the statements when making them.

228.    Defendants knew or should have recognized that Accel might act in reliance on the false and or untrue statements, causing Ayr Energy, Mr. Reddy's business, financial harm. Defendants knew or should have recognized that other potential partners of Mr. Stuckey might act in reliance on the false and or untrue statements causing Mr. Stuckey financial harm.

229.    Defendants' statements, as alleged herein, have caused substantial irreparable harm to Plaintiffs, including, without limitation, monetary loss from lost business, interference with and damage to Ayr Energy's standing in the marketplace and Plaintiffs' business relationships with actual and potential partners, interference with and damage to Ayr Energy's reputation and goodwill in the industry, attorneys' fees and costs, lost executive time, and other damages.

1

**FOURTH CLAIM FOR RELIEF**

2

**(on behalf of all Plaintiffs against all Defendants)**

3

**(Defamation under Cal. Civ. Code § 45(a) (Libel))**

4      230.    Plaintiffs reallege and incorporate by reference herein each and every allegation set

5      forth above.

6      231.    Defendants defamed Plaintiffs through written libelous statements made to the

7      public.  Specifically, Defendants libeled Plaintiffs through their unsubstantiated, false, and

8      unprivileged allegations to investors and the media that Plaintiffs had misappropriated Defendants'

9      purported trade secrets, that Mr. Reddy misrepresented the nature of Ayr Energy's business to

10     Defendants, and that Mr. Reddy is "dishonest."

11     232.    Defendants' written statements are defamatory of Plaintiffs without the necessity of

12     explanatory matter, and as such constitute libel on its face.

13     233.    Moreover, Defendants' defamatory statements have caused substantial harm to

14     Plaintiffs, including, without limitation, monetary loss from lost business, interference with and

15     damage to Ayr Energy's standing in the marketplace and Plaintiffs' relationships with actual and

16     potential partners, interference with and damage to Plaintiffs' reputation and goodwill in the

17     industry, attorneys' fees and costs, lost executive time, and other damages.

18

**FIFTH CLAIM FOR RELIEF**

19

**(on behalf of Ayr Energy and Mr. Reddy against all Defendants)**

20

**(Defamation under Cal. Civ. Code § 46 (Slander))**

21     234.    Plaintiffs Ayr Energy and Mr. Reddy reallege and incorporate by reference herein

22     each and every allegation set forth above.

23     235.    Defendants defamed Ayr Energy and Mr. Reddy through slander.  Specifically,

24     Defendants slandered Ayr Energy and Mr. Reddy through orally uttered, false, and unprivileged

25     publications to investors and the media that Ayr Energy and Mr. Reddy had misappropriated

26     Defendants' purported trade secrets.  These includes defamatory statements made by Defendants

27     to at least Accel that Mr. Reddy and Ayr Energy misappropriated trade secrets, that Mr. Reddy

28

1   misrepresented the nature of Ayr Energy, and that Mr. Reddy was dishonest made by Defendants

2   to Accel.

3         236.    On information and belief, Defendants made similar defamatory statements to other

4   third parties, including to media organizations.

5         237.    Defendants' orally uttered statements injured Ayr Energy and Mr. Reddy with

6   respect to their office, profession, trade and business, by imputing to Ayr Energy and Mr. Reddy a

7   general disqualification in those respects or by imputing something with reference to their office,

8   profession, trade, or business that had a natural tendency to lessen its profits.

9         238.    Defendants' statements, as alleged herein, have caused substantial irreparable harm

10   to Ayr Energy and Mr. Reddy, including, without limitation, monetary loss from lost business,

11   interference with and damage to Ayr Energy's standing in the marketplace and Ayr Energy and Mr.

12   Reddy's relationships with actual and potential partners, interference with and damage to Ayr

13   Energy and Mr. Reddy's reputation and goodwill in the industry, attorneys' fees and costs, lost

14   executive time, and other damages.

15                       **SIXTH CLAIM FOR RELIEF**

16              **(on behalf of all Plaintiffs against all Defendants)**

17             **(Defamation under California Common Law)**

18         239.    Plaintiffs reallege and incorporate by reference herein each and every allegation set

19   forth above.

20         240.    Defendants defamed Plaintiffs through written and orally uttered statements made

21   to the public.  These statements are defamatory because, as alleged above, they are libelous and

22   slanderous.  Specifically, Defendants defamed Plaintiffs through their unsubstantiated, false, and

23   unprivileged allegations to investors and the media that Plaintiffs had misappropriated Defendants'

24   purported trade secrets.

25         241.    Defendants' statements are those that have a natural tendency to injury.  And, as

26   alleged herein, Defendants' statements have caused substantial irreparable harm to Plaintiffs,

27   including, without limitation, monetary loss from lost business, interference with and damage to

28   Ayr Energy's standing in the marketplace and Plaintiffs' relationships with actual and potential

partners, interference with and damage to Plaintiffs' reputation and goodwill in the industry, attorneys' fees and costs, lost executive time, and other damages.

## SEVENTH CLAIM FOR RELIEF

### (on behalf of Ayr Energy against all Defendants)

### (Tortious Interference with Prospective Economic Relations)

242.    Plaintiff Ayr Energy realleges and incorporates by reference herein each and every allegation set forth above.

243.    Defendants intentionally interfered with Ayr Energy's economic relationship with its investors that would have resulted in an economic benefit to Ayr Energy.

244.    For instance, Defendants disrupted the economic relationship that existed between Ayr Energy and Accel by defaming Ayr Energy and encouraging Accel to renege on its potential investment in Ayr Energy of millions of dollars as contemplated by a term sheet.

245.    Defendants similarly disrupted the relationships between Ayr Energy and its customers, including but not limited to a $40,000,000 customer contract.

246.    Defendants knew of the prospective relationship between Ayr Energy and Accel, and that a relationship between Ayr Energy and Accel would have resulted in economic benefits to Ayr Energy.

247.    By engaging in this conduct, Defendants intended to disrupt, or knew that disruption of the relationship was certain or substantially certain to occur.

248.    And, as a result of Defendants' conduct, investors and customers ended their relationships with Ayr Energy causing Ayr Energy harm, including irreparable harm, and including but not limited to damage to Plaintiffs' reputation and goodwill in the industry, the loss of millions of dollars in investment funding, and lost profits in an amount to be determined at trial in the hundreds of millions of dollars.

1

2

3

**EIGHTH CLAIM FOR RELIEF**

**(on behalf of Ayr Energy against Zetwerk India)**

**(Abuse of Process Under California Common Law)**

4      249.    Plaintiff Ayr Energy realleges and incorporates by reference herein each and every

5    allegation set forth above.

6      250.    Zetwerk India improperly sought a subpoena against Ayr Energy under 28 U.S.C.

7    § 1782.  Zetwerk India alleged in its Delaware action that it sought documents from third party Ayr

8    Energy in connection with its a trade secret misappropriation suit against Mr. Reddy in India and

9    not in connection with a future suit against Ayr Energy.

10      251.    However, months earlier, Zetwerk's General Counsel John Thaliath informed

11    Zetwerk investors that Zetwerk intended to enter "adversarial proceedings ***against AYR Energy***

12    Andiruddh [sic] Reddy and other individuals involved, in India ***and the United States***." (emphasis

13    added).

14      252.    Furthermore, on or about October 17, 2025, Zetwerk and Unimacts brought the very

15    litigation it threatened against Ayr Energy in Texas.

16      253.    The inconsistencies between (1) Mr. Thaliath's email to Zetwerk investors and its

17    filing of the Texas suit on the one hand, and (2) Zetwerk India's statements to the Delaware court

18    that it did not seek discovery for a proceeding against Ayr Energy and that it did not know what if

19    anything Mr. Reddy took from Zetwerk India, expose Zetwerk India's true motivations: Zetwerk

20    India intended to use its § 1782 subpoena to Ayr Energy as a fishing expedition to prepare for the

21    lawsuit Zetwerk always intended to file against Ayr Energy and Mr. Reddy in the United States.

22    That Zetwerk India named Zetwerk US—the subsidiary Zetwerk India ***fully*** owns—as a defendant

23    in its Indian suit but then brought suit against Plaintiffs in Texas with Zetwerk US as a co-plaintiff

24    further demonstrates the sham it promulgated when attempting to subpoena Ayr Energy.  The

25    Delaware court, recognizing, among other things, that Zetwerk India had promulgated an overly

26    broad and burdensome subpoena to Ayr Energy, denied the request.

27      254.    Zetwerk India's improper subpoena to Ayr Energy, as alleged herein, has caused

28    substantial irreparable harm to Ayr Energy, including, without limitation, monetary loss from lost

business, interference with and damage to Ayr Energy's standing in the marketplace and relationships with actual and potential partners, interference with and damage to Ayr Energy's reputation and goodwill in the industry, attorneys' fees and costs, lost executive time, and other damages.

### NINTH CLAIM FOR RELIEF

### (on behalf of Mr. Reddy against Zetwerk US)

### (Breach of Cal. Lab. Code §§ 201, 202, 203)

255.    Plaintiff Mr. Reddy realleges and incorporates by reference herein each and every allegation set forth above.

256.    Cal. Lab. Code § 200 defines "Wages" as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

257.    Cal. Lab. Code § 200 defines "Labor" as "labor, work, or service whether rendered or performed under contract, subcontract, partnership, station plan, or other agreement if the labor to be paid for is performed personally by the person demanding payment."

258.    Cal.    Lab.    Code    § 202    provides,    in    relevant    part,    that: "If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting.  Notwithstanding any other law, an employee who quits without providing a 72-hour notice shall be entitled to receive payment by mail if he or she so requests and designates a mailing address. The date of the mailing shall constitute the date of payment for purposes of the requirement to provide payment within 72 hours of the notice of quitting."

259.    Cal. Lab. Code § 203 provides, in relevant part, that: "If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 201.6, 201.8, 201.9, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages

of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days."

260.    Mr. Reddy performed labor for Zetwerk US, under his employment contract, was entitled a bonus if he met certain metrics.  Though he met these metrics, Mr. Reddy did not receive his bonus.  Instead, Zetwerk US withheld his duly-earned bonus as a form of retaliation to Mr. Reddy for leaving the companies.

261.    Therefore, as provided by Cal. Lab. Code § 203, Mr. Reddy demands thirty days of pay as penalty for not paying all wages due at the time of termination.  Mr. Reddy also demands an accounting and payment of all wages due, plus interest (as provided by Cal. Lab. Code § 218.6), and attorneys' fees and interest (as provided by Cal. Lab. Code § 218.5).

### TENTH CLAIM FOR RELIEF

### (on behalf of Mr. Reddy against Defendants Zetwerk US)

### (Breach of Contract Under California Common Law)

262.    Plaintiff Mr. Reddy realleges and incorporates by reference herein each and every allegation set forth above.

263.    Mr. Reddy's employment agreements with Zetwerk US and Zetwerk India were, independently, valid and enforceable contracts.

264.    Mr. Reddy fulfilled and, in fact, exceeded his responsibilities under his employment agreement with Zetwerk US.

265.    As discussed above, Zetwerk US did not pay Mr. Reddy the bonus that his employment agreement entitled him to.

266.    Zetwerk US's failure to pay Mr. Reddy his bonuses under the respective employment agreements constitutes breaches of his employment agreement.

267.    Zetwerk US's breaches of its employment agreements with Mr. Reddy caused Mr. Reddy harm, including irreparable harm and monetary harm because Mr. Reddy was entitled to at least hundreds of thousands of dollars in unpaid bonus compensation and additional amounts of unpaid wages.

**ELEVENTH CLAIM FOR RELIEF**

**(on behalf of Mr. Reddy against all Defendants)**

**(Unjust Enrichment Under California Common Law)**

268.    Plaintiff Mr. Reddy realleges and incorporates by reference herein each and every allegation set forth above.

269.    As outlined above, Mr. Reddy was an employee of Zetwerk US.

270.    As discussed above, Zetwerk US withheld Mr. Reddy's bonus.

271.    Neither Zetwerk nor Unimacts paid Mr. Reddy for the work he performed for Unimacts.

272.    Furthermore, Mr. Reddy was not paid for any work performed after January 15, 2025 as professional courtesy.

273.    Defendants were, thus, unjustly enriched at the expense of and to the detriment of Mr. Reddy by retaining the payment to which he was entitled under the Zetwerk US employment agreement.    Defendants were also unjustly enriched through Mr. Reddy's unpaid work for Unimacts and his unpaid work after January 15, 2025.

274.    Mr. Reddy seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct in withholding Mr. Reddy's wages.

275.    Mr. Reddy has no adequate remedy at law.

**TWELFTH CLAIM FOR RELIEF**

**(on behalf of all Plaintiffs against all Defendants)**

**(Unfair Competition - Cal. Bus. & Prof. Code § 17200, *et seq.*)**

276.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth above.

277.    California's UCL defines unfair competition to include "any unlawful, unfair, or fraudulent business act or practice."

278.    Defendants are "persons" within the meaning of the UCL.

279.     Defendants' acts are "unlawful" within the meaning of the UCL, including but not limited to because Defendants' conduct violates the Lanham Act.

280.     Defendants' acts are "unfair" within the meaning of the UCL, including because Defendants' conduct, as detailed above, significantly threatens and harms competition in the market because Ayr Energy and Defendants are competitors, and Defendants are interfering with Ayr Energy's business relationships, customer relationships, financings, and falsely advertising to consumers, and attacking Plaintiffs' credibility and reputation.

281.     Defendants' acts are "fraudulent business act[s] or practice[s]" within the meaning of the UCL, including because Defendants' conduct, as detailed above, consist of false and misleading statements regarding their capabilities, as well as false and misleading statements regarding Plaintiffs and their business.

282.     Defendants' acts are "unfair, deceptive, untrue or misleading advertising" within the meaning of the UCL, including because Defendants' conduct, as detailed above, consists of false and misleading statements regarding their capabilities, as well as false and misleading statements regarding Plaintiffs and their business.

283.     Defendants' business acts and practices were targeted at customers and audiences within the State of California, and intended to cause harm within the State of California.

284.     Plaintiffs have suffered and will continue to suffer harm as the direct and proximate result of Defendants' unfair acts and practices.

285.     Defendants' business acts and practices, as alleged herein, have caused substantial irreparable harm to Plaintiffs, including, without limitation, monetary loss from lost business, interference with and damage to Ayr Energy's standing in the marketplace and relationships with actual and potential partners, interference with and damage to Plaintiffs' reputation and goodwill in the industry, attorneys' fees and costs, lost executive time, and other damages.

286.     Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiffs seek an injunction and restitution in the maximum amount permitted by law and equity.

**THIRTEENTH CLAIM FOR RELIEF**

**(on behalf of Mr. Reddy against Zetwerk US)**

**(Declaratory Judgement of Void Forum Selection Clause Under Cal. Lab. Code § 925)**

287.    Plaintiff Mr. Reddy realleges and incorporates by reference herein each and every allegation set forth above.

288.    There is an actual controversy between Mr. Reddy and Defendants on the basis that Mr. Reddy seeks to void a provision in his employment agreement with Zetwerk US that violates Cal. Lab. Code § 925.

289.    Cal. Lab. Code § 925(a) provides that "[a]n employer shall not require an employee who primarily resides and works in California, as a condition of employment, to agree to a provision that would do either of the following:  (1) Require the employee to adjudicate outside of California a claim arising in California [or] (2) Deprive the employee of the substantive protection of California law with respect to a controversy arising in California."

290.    Cal. Lab. Code § 925(b) provides, in relevant part, that "any provision of a contract that violates subdivision (a) is voidable by the employee, and if a provision is rendered void at the request of the employee, the matter shall be adjudicated in California and California law shall govern the dispute."

291.    As discussed above, Mr. Reddy entered into an employment agreement with Zetwerk US.  This agreement contained a forum selection provision requiring that Mr. Reddy "consent to the exclusive jurisdiction of, and venue in, the state or federal courts in Delaware."

292.    Mr. Reddy was not represented by legal counsel in negotiating the terms of his employment agreement with Zetwerk US.

293.    Upon entering into an employment agreement with Zetwerk US and at its request, Mr. Reddy relocated to the state of California and performed the majority of his work for Zetwerk US within the state of California.

294.    The forum selection provision in Mr. Reddy's employment agreement with Zetwerk US violates Cal. Lab. Code § 925(a).  Mr. Reddy is now requesting the Court void the provision under § 925(b).

1    295.    Mr. Reddy is entitled to injunctive and equitable relief that: (a) voids the above-

2    described forum selection clause; and (b) prohibits Defendants from attempting to enforce this

3    provision, either directly or indirectly, as well as an award of reasonable attorneys' fees and costs

4    spent in enforcing his rights.  Mr. Reddy reserves the right to recover damages and other relief

5    warranted by Defendants' use and enforcement of void forum selection clauses.

6    **FOURTEENTH CLAIM FOR RELIEF**

7    **(on behalf of Mr. Reddy against Zetwerk US)**

8    **(Declaratory Judgement of Unenforceable Confidentiality Provision**

9    **Under Cal. Bus. & Prof. Code § 16600)**

10    296.    Plaintiff Mr. Reddy realleges and incorporates by reference herein each and every

11    allegation set forth above.

12    297.    There is an actual controversy between Mr. Reddy and Defendants on the basis that

13    Defendants are attempting to enforce a contract that is unenforceable under Cal. Bus. & Prof. Code

14    § 16600.

15    298.    Cal. Bus. & Prof. Code § 16600(a) provides that "[e]xcept as provided in this

16    chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade,

17    or business of any kind is to that extent void."

18    299.    Cal. Bus. & Prof. Code § 16600.5 further provides, in relevant part, that "[a]ny

19    contract that is void under this chapter is unenforceable regardless of where and when the contract

20    was signed" and that "[a]n employer or former employer shall not attempt to enforce a contract that

21    is void under this chapter regardless of whether the contract was signed and the employment was

22    maintained outside of California."

23    300.    As discussed above, Mr. Reddy entered an employment agreement with Zetwerk

24    US.  This agreement contained a confidentiality provision that purported to protect unspecified

25    "confidential" information.

26    301.    This provision is void under Cal. Bus. & Prof. Code § 16600 because Defendants

27    are using this provision to restrain Mr. Reddy from engaging in lawful business.

28

47

302.    For instance, the confidentiality provision purports to prohibit Mr. Reddy from disclosing information related to a number of undefined and vague terms, which allow Zetwerk claim an overbroad set of information as "confidential" in a way that unduly restricts Mr. Reddy's ability to work for a competitor in violation of California law.

303.    Mr. Reddy is therefore entitled to a declaratory judgment that: (a) voids the above-described confidentiality restrictions; and (b) prohibits Defendants from attempting to enforce these provisions, either directly or indirectly, as well as an award of reasonable attorneys' fees and costs spent in enforcing his rights.  Mr. Reddy reserves the right to recover damages and other relief warranted by Defendants' use and enforcement of void confidentiality restrictions that operate as a *de facto* non-compete.

## FIFTEENTH CLAIM FOR RELIEF

### (on behalf of Mr. Reddy against Zetwerk US and Zetwerk India)

### (Violation of Cal. Bus. & Prof. Code § 16600.5(d))

304.    Plaintiff Mr. Reddy realleges and incorporates by reference herein each and every allegation set forth above.

305.    Cal. Bus. & Prof. Code § 16600.5(d) provides that "[a]n employer that enters into a contract that is void under this chapter or attempts to enforce a contract that is void under this chapter commits a civil violation."

306.    Cal. Bus. & Prof. Code § 16600.5(a) prohibits an employer form enforcing a contract void under Cal. Bus. & Prof. Code § 16600(a).

307.    As outlined above, the contracts between Mr. Reddy and Zetwerk US and Zetwerk India, respectively, are void and unenforceable under Cal. Bus. & Prof. Code §§ 16600(a), 16600.5(a).

308.    Because Defendants are attempting to enforce a contract provision that is void under Cal. Bus. & Prof. Code § 16600 and in a way that would turn the provision into a *de facto* non-compete, they have committed a civil violation under Cal. Bus. & Prof. Code § 16600.5.

309.    Mr. Reddy is therefore entitled to injunctive and equitable relief that: (a) voids the above-described confidentiality restrictions; and (b) prohibits Defendants from attempting to

enforce these provisions, either directly or indirectly, as well as an award of reasonable attorneys'

fees and costs spent in enforcing his rights.  Mr. Reddy reserves the right to recover damages and

other relief warranted by Defendants' use and enforcement of void confidentiality restrictions that

operate as a *de facto* non-compete.

## SIXTEENTH CLAIM FOR RELIEF

### (on behalf of Mr. Reddy against Zetwerk India and Zetwerk US)

### (Declaratory Judgement of No Breach of Confidentiality Provision)

310.    Plaintiff Mr. Reddy realleges and incorporates by reference herein each and every

allegation set forth above.

311.    There is an actual controversy between Mr. Reddy and Defendants on the basis that

Defendants assert that Mr. Reddy has breached the confidentiality provisions of his Zetwerk India

and Zetwerk US contracts.

312.    Mr. Reddy did not breach those provisions.

313.    In addition, no claim for breach of contract against Mr. Reddy can prevail because

the contract provision at issue is invalid and unenforceable, for reasons discussed above.

314.    Mr. Reddy is therefore entitled to a declaratory judgment that he did not breach any

confidentiality obligations owed to Zetwerk India or Zetwerk US.

## SEVENTEENTH CLAIM FOR RELIEF

### (on behalf of Mr. Stuckey against Unimacts)

### (Declaratory Judgement of Unenforceable Confidentiality Provision)

315.    Plaintiff Mr. Stuckey realleges and incorporates by reference herein each and every

allegation set forth above.

316.    There is an actual controversy between Mr. Stuckey and Defendants on the basis

that Defendants are attempting to enforce a contract that is unenforceable.

317.    Cal. Bus. & Prof. Code § 16600(a) provides that "[e]xcept as provided in this

chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade,

or business of any kind is to that extent void."

318.    Cal. Bus. & Prof. Code § 16600.5 further provides, in relevant part, that "[a]ny contract that is void under this chapter is unenforceable regardless of where and when the contract was signed" and that "[a]n employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California."

319.    As discussed above, Mr. Stuckey entered into an employment agreement with Unimacts.  This agreement contained a confidentiality provision void under Cal. Bus. & Prof. Code § 16600 because Defendants are using this provision to restrain Mr. Stuckey from engaging in lawful business.

320.    For instance, Defendants contend that the confidentiality provision Defendants cite in their Texas complaint from the Unimacts employee handbook prohibits Mr. Stuckey from intentionally and unintentionally disclosing any confidential information, defined overbroadly to include virtually anything even tenuously related to Unimacts,  and "any other information which [Unimacts] identifies, classifies, or otherwise treats as confidential."[45]  In essence, according to Defendants, the vague and undefined terms in the provision allow Unimacts to keep the door open as to what it does not want Mr. Stuckey to discuss and they can then wield that information against him to handicap his employment mobility.

321.    To the extend even binding, the provision also is impermissibly vague, unconscionable, and unenforceable under fundamental requirements of contract law.

322.    Mr. Stuckey is therefore entitled to a declaratory judgment that: (a) voids the above-described confidentiality restrictions, along with any other non-compete provisions in his agreement with Unimacts; and (b) prohibits Defendants from attempting to enforce these provisions, either directly or indirectly, as well as an award of reasonable attorneys' fees and costs spent in enforcing his rights.  Mr. Stuckey reserves the right to recover damages and other relief warranted by Defendants' use and enforcement of void confidentiality restrictions that operate as a *de facto* non-compete.

---

[45] *Unimacts Glob.*, 2025-79599, D.I. 1 ¶ 79.

**EIGHTEENTH CLAIM FOR RELIEF**

**(on behalf of Mr. Stuckey against Unimacts)**

**(Declaratory Judgement of No Breach of Confidentiality Provision)**

323.    Plaintiff Mr. Stuckey realleges and incorporates by reference herein each and every allegation set forth above.

324.    There is an actual controversy between Mr. Stuckey and Unimacts on the basis that Defendants asserts that Mr. Stuckey has breached the confidentiality provision of his Unimacts contract.

325.    Mr. Stuckey did not breach that provision.

326.    In addition, no claim for breach of contract against Mr. Stuckey can prevail because the contract provision at issue is invalid and unenforceable, for reasons discussed above.

327.    Mr. Stuckey is therefore entitled to a declaratory judgment that he did not breach any confidentiality obligation owed to Unimacts.

**NINETEENTH CLAIM FOR RELIEF**

**(on behalf of Mr. Stuckey against Unimacts)**

**(Declaratory Judgement of Unenforceable Non-Compete Provision)**

328.    Plaintiff Mr. Stuckey realleges and incorporates by reference herein each and every allegation set forth above.

329.    There is an actual controversy between Mr. Stuckey and Defendants on the basis that Defendants are attempting to enforce a non-compete provision that is unenforceable.

330.    As discussed above, Mr. Stuckey entered into an employment agreement with Unimacts.  In addition to the confidentiality provision that is a *de facto* noncompete, this agreement also contained a noncompete provision that is impermissibly vague, unconscionable, and unenforceable under fundamental requirements of contract law, and it is void under Cal. Bus. & Prof. Code § 16600.

331.    The provision at issue is a vague, overbroad, and unreasonable non-compete provisions in Mr. Stuckey's employment agreement.  That non-compete clause's breadth purports to restrict Mr. Stuckey from engaging ***anywhere in the world*** for a period of two years, directly or

indirectly, "in any business that competes or intends to compete with any activity" in which Unimacts has engaged or has any plans to engage in. Unimacts's failure to define the covered business territory combined with the unreasonable temporal and geographic restrictions would serve to prevent Mr. Stuckey from working in nearly ***any job anywhere***, far exceeding any legitimate economic interest of Unimacts.

332.    The provision is unreasonable on its face, and does not articulate or define Unimacts's business activity with any specificity. For instance, the clause goes beyond limiting Mr. Stuckey to not competing in the specific areas in which he worked and seeks to prohibit him from working with any company that "develops or provides products or services which [Unimacts] provides or has provided" and in activities related to "any product or service under development" or that Unimacts has marketing plans for. Defendants cannot use this provision, which far exceeds any legitimate economic interest of Unimacts, to so egregiously restrain Mr. Stuckey in his employment. The vague and undefined terms here, like those in Mr. Stuckey's confidentiality provisions, allow Unimacts to keep the door open in how it will hinder Mr. Stuckey's employment mobility.

333.    Cal. Bus. & Prof. Code § 16600(a) provides that "[e]xcept as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void."

334.    Cal. Bus. & Prof. Code § 16600.5 further provides, in relevant part, that "[a]ny contract that is void under this chapter is unenforceable regardless of where and when the contract was signed" and that "[a]n employer or former employer shall not attempt to enforce a contract that is void under this chapter regardless of whether the contract was signed and the employment was maintained outside of California."

335.    Moreover, the noncompete provision's overbreadth directly conflicts with the solicitation provision of the contract that explicitly safeguards any "existing relationship with a customer, vendor or supplier that was established before [Mr. Stuckey] joined [Unimacts]."

336.    Mr. Stuckey is therefore entitled to a declaratory judgment that: (a) voids the above-described confidentiality restrictions, along with any other non-compete provisions in his

agreement with Unimacts; and (b) prohibits Defendants from attempting to enforce these provisions, either directly or indirectly, as well as an award of reasonable attorneys' fees and costs spent in enforcing his rights. Mr. Stuckey reserves the right to recover damages and other relief warranted by Defendants' use and enforcement of void confidentiality restrictions that operate as a *de facto* non-compete.

## TWENTIETH CLAIM FOR RELIEF

### (on behalf of Mr. Stuckey against Unimacts)

### (Declaratory Judgement of No Breach of Non-Compete Provision)

337.    Plaintiff Mr. Stuckey realleges and incorporates by reference herein each and every allegation set forth above.

338.    There is an actual controversy between Mr. Stuckey and Unimacts on the basis that Defendants asserts that Mr. Stuckey has breached the non-compete provision of his Unimacts contract.

339.    Mr. Stuckey did not breach that provision, including because the provision is invalid and unenforceable.

340.    Mr. Stuckey is therefore entitled to a declaratory judgment that he did not breach any non-compete obligation owed to Unimacts.

## TWENTY-FIRST CLAIM FOR RELIEF

### (on behalf of Mr. Stuckey against Unimacts)

### (Violation of Cal. Bus. & Prof. Code § 16600.5(d))

341.    Plaintiff Mr. Stuckey realleges and incorporates by reference herein each and every allegation set forth above.

342.    Cal. Bus. & Prof. Code § 16600.5(d) provides that "[a]n employer that enters into a contract that is void under this chapter or attempts to enforce a contract that is void under this chapter commits a civil violation."

343.    Cal. Bus. & Prof. Code § 16600.5(a) prohibits an employer form enforcing a contract void under Cal. Bus. & Prof. Code § 16600(a).

344.    As outlined above, the contract between Mr. Stuckey and Unimacts is void and unenforceable under Cal. Bus. & Prof. Code §§ 16600(a), 16600.5(a).

345.    Because Defendants are attempting to enforce a contract that is void under Cal. Bus. & Prof. Code § 16600, they have committed a civil violation under Cal. Bus. & Prof. Code § 16600.5.

346.    Mr. Stuckey is therefore entitled to injunctive and equitable relief that: (a) voids the above-described confidentiality restrictions and non-compete provisions, along with any other non-compete provision in his agreement with Unimacts; and (b) prohibits Defendants from attempting to enforce these provisions, either directly or indirectly, as well as an award of reasonable attorneys' fees and costs spent in enforcing his rights.  Mr. Stuckey reserves the right to recover damages and other relief warranted by Defendants' use and enforcement of void confidentiality restrictions that operate as a *de facto* non-compete and the non-compete provision itself.

**TWENTY-SECOND CLAIM FOR RELIEF**

**(on behalf of all Plaintiffs against all Defendants)**

**(Declaratory Judgment of No Trade Secret Misappropriation**

**under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*)**

347.    Plaintiffs reallege and incorporate by reference herein each and every allegation set forth above.

348.    There is an actual controversy between Plaintiffs and Defendants on the basis that Defendants have accused Plaintiffs of misappropriating Defendants' purported trade secrets.

349.    Defendants have alleged that their purported trade secrets include customer lists, strategic plans, other documents embodying or containing their trade secrets, and knowledge that Mr. Reddy and Mr. Stuckey already possessed.

350.    Plaintiffs deny that the materials and knowledge alleged by Defendants constitute trade secrets.

351.    Plaintiffs deny that Defendants' purported trade secrets derive economic value from their secrecy.

352.     Plaintiffs deny that Defendants have taken reasonable measures to protect the confidentiality of their purported trade secrets.

353.     Plaintiffs deny that they have misappropriated Defendants' purported trade secrets.

354.     Plaintiffs deny that Defendants have been harmed by any alleged misappropriation of their trade secrets.

355.     Plaintiffs did not acquire Defendants' purported trade secrets by improper means or otherwise.

356.     Plaintiffs did not did not disclose Defendants' purported trade secrets.

357.     Plaintiffs did not use Defendants' purported trade secrets.

358.     Accordingly, Plaintiffs are entitled to a declaratory judgment that Plaintiffs have not misappropriated any trade secrets from Defendants in violation of the DTSA.

### TWENTY-THIRD CLAIM FOR RELIEF

### (on behalf of all Plaintiffs against all Defendants)

### (Declaratory Judgment of No Misappropriation

### Under California Uniform Trade Secrets Act (CUTSA) (Cal. Civ. Code § 3426 *et seq.*))

359.     Plaintiffs reallege and incorporate by reference herein each and every allegation set forth above.

360.     As outlined above, an actual controversy exists between the parties.

361.     Plaintiffs have not committed trade secret misappropriation in violation of the California Uniform Trade Secrets Act (CUTSA) (Cal. Civ. Code § 3426 *et seq.*).

362.     Plaintiffs deny that Defendants have trade secrets.

363.     Plaintiffs deny that Defendants' purported trade secrets derive economic value from their secrecy.

364.     Plaintiffs deny that Defendants have taken reasonable measures to protect the confidentiality of their purported trade secrets.

365.     Plaintiffs deny that Defendants have been harmed by any alleged misappropriation of their trade secrets.

366.     Plaintiffs deny that they have misappropriated Defendants' purported trade secrets.

367. Plaintiffs did not acquire Defendants' purported trade secrets by improper means or otherwise.

368. Plaintiffs did not did not disclose Defendants' purported trade secrets.

369. Plaintiffs did not use Defendants' purported trade secrets.

370. Accordingly, Plaintiffs are entitled to a declaratory judgment that Plaintiffs have not misappropriated any trade secrets from Defendants in violation of the CUTSA.

<u>**TWENTY-FOURTH CLAIM FOR RELIEF**</u>

<u>**(on behalf of all Plaintiffs against all Defendants)**</u>

<u>**(Declaratory Judgment of No Misappropriation Under the Texas Uniform Trade Secrets Act (TUTSA) Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq.*))**</u>

371. Plaintiffs reallege and incorporate by reference herein each and every allegation set forth above.

372. As outlined above, an actual controversy exists between the parties.

373. Plaintiffs have not committed trade secret misappropriation in violation of the Texas Uniform Trade Secrets Act (TUTSA) Tex. Civ. Prac. & Rem. Code § 134A.001 *et seq.*

374. Plaintiffs deny that any facts pertinent to any alleged trade secrets misappropriation claims occurred in Texas.

375. Plaintiffs deny that Defendants have trade secrets.

376. Plaintiffs deny that Defendants' purported trade secrets derive economic value from their secrecy.

377. Plaintiffs deny that Defendants have taken reasonable measures to protect the confidentiality of their purported trade secrets.

378. Plaintiffs deny that Defendants have been harmed by any alleged misappropriation of their trade secrets.

379. Plaintiffs deny that they have misappropriated Defendants' purported trade secrets.

380. Plaintiffs did not acquire Defendants' purported trade secrets by improper means or otherwise.

381. Plaintiffs did not did not disclose Defendants' purported trade secrets.

382.    Plaintiffs did not use Defendants' purported trade secrets.

383.    Accordingly, Plaintiffs are entitled to a declaratory judgment that Plaintiffs have not misappropriated any trade secrets from Defendants in violation of the TUTSA.

**TWENTY-FIFTH CLAIM FOR RELIEF**

**(on behalf of Mr. Reddy and Mr. Stuckey against all Defendants)**

**(Declaratory Judgment of No Breach of Fiduciary Duty Under Cal. Corp. Code § 309))**

384.    Plaintiffs Mr. Reddy and Mr. Stuckey reallege and incorporate by reference herein each and every allegation set forth above.

385.    There is an actual controversy between Mr. Reddy and Defendants on the basis that Defendants have accused Mr. Reddy and Mr. Stuckey of breaching their fiduciary duties.

386.    Cal. Corp. Code § 309 provides in relevant part that: "A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."

387.    Mr. Reddy did not breach the fiduciary duty owed to Zetwerk US.  Mr. Reddy performed his duties as an executive of Zetwerk US in good faith and in the best interest of the corporations and their shareholders with such care, including reasonably inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

388.    Nor did he breach any fiduciary duty to Unimacts.  At all times while serving as a member of Unimacts's board, Mr. Reddy operated in good faith and in the best interests of the company in accordance with Cal. Corp. Code § 309.

389.    Mr. Reddy also did not owe a fiduciary duty to Zetwerk India because he was not an executive at Zetwerk India.

390.    Likewise, Mr. Stuckey did not owe a fiduciary duty to any Defendant because he was not an executive, director, or board member of any Defendant.

391.    Because Mr. Reddy did not breach his fiduciary duty to Defendants and because Mr. Stuckey did not owe Defendants a fiduciary duty, Defendants have not been harmed.

392.    Accordingly, Mr. Reddy and Mr. Stuckey are entitled to a declaratory judgment that Plaintiffs have not breached a fiduciary duty under Cal. Corp. Code § 309.

## TWENTY-SIXTH CLAIM FOR RELIEF

### (on behalf of Ayr Energy against all Defendants)

### (Declaratory Judgment of No Aiding and Abetting a Breach of Fiduciary Duty Under California Common Law)

393.    Plaintiff Ayr Energy realleges and incorporates by reference herein each and every allegation set forth above.

394.    There is an actual controversy between Ayr Energy and Defendants on the basis that Defendants have accused Ayr Energy of knowing participation in a breach of fiduciary duty.

395.    As outlined above, Mr. Reddy and Mr. Stuckey did not breach any fiduciary duties to Defendants and so Defendants were not harmed.

396.    If a breach of fiduciary duty was committed, Ayr Energy did not know of it, did not provide any substantial assistance or encouragement, and did not participate in any conduct that would have been a substantial factor in causing harm to Defendants.

397.    Ayr Energy did not give substantial assistance or encouragement to any party who breached their fiduciary duty to Defendants.

398.    Accordingly, Ayr Energy is entitled to a declaratory judgment that it has not aided or abetted a breach of a fiduciary duty.

## PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court enter judgment in its favor on each and every claim for relief set forth above and award it the following relief, including but not limited to:

a) A preliminary and permanent injunction enjoining Defendants from defaming Plaintiffs, tortiously interfering with Plaintiffs' actual or prospective relationships, engaging in further false and misleading advertising, and engaging in further unfair competition and other violations of law, including Cal. Bus. & Prof. Code § 16600;

b) An award of Plaintiffs' actual damages and Defendants' profits attributable to their violations of law;

c) An award pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117 of up to three times the amount of Plaintiffs' actual monetary damages according to proof, but in no case less than double their damages, exclusive of interest and costs plus prejudgment interest, resulting from Defendants' false advertising;

d) An award pursuant to § 35 of the Lanham Act, 15 U.S.C. § 1117, of an accounting of Defendants' profits resulting from their Lanham Act violations and a disgorgement of those profits in an amount to be proven at trial;

e) An award to Mr. Reddy of the compensation he is owed by Defendants;

f) An award of unjust enrichment caused by Defendants' wrongful conduct to the extent that it is not addressed in computing damages otherwise;

g) An award of compensatory, consequential, special, exemplary, punitive, and treble damages, including for Defendants' willful, malicious conduct;

h) An order that Defendants breached their contractual obligations to Mr. Reddy by improperly withholding his compensation;

i) An order that Defendants engage, at their own cost, in corrective advertising necessary to correct the false, misleading, and defamatory statements it made about themselves and Plaintiffs;

j) An order that Defendants retract and correct prior defamatory statements made to third parties;

k) An order declaring that the forum selection clause of Mr. Reddy's Zetwerk employment agreement is void and unenforceable under California Labor Code § 925;

l) An order declaring that the confidentiality provisions of Mr. Reddy and Mr. Stuckey's employment agreements with Defendants were not breached and are void and unenforceable, and an order enjoining Zetwerk from enforcing the same on the basis that the provisions operate as a *de facto* non-competes in violation of Cal. Bus. & Prof. Code § 16600;

59

m) An order declaring that the non-compete provision of Mr. Stuckey's contract with Unimacts was not breached and is void and unenforceable;

n) An order declaring that Plaintiffs did not misappropriate any trade secrets under the federal Defend Trade Secrets Act or state law;

o) An order declaring that Plaintiffs did not breach any fiduciary duty or aid and abet any such breach;

p) An order requiring Defendants to pay Plaintiffs' costs and attorney fees in this action pursuant to 15 U.S.C. § 1117, 18 U.S.C. § 1836(b)(3)(D), Cal. Bus. & Prof. Code § 16600, Cal. Civ. Code § 218.5, and other applicable statutes and laws;

q) An award of any applicable prejudgment and post-judgment interest according to law; and

r) Such other and further relief as the Court may deem appropriate, including without limitation all remedies provided for under any other applicable laws.

## JURY DEMAND

Plaintiffs respectfully demand a jury trial pursuant to Fed. R. Civ. P. 38 on all issues so triable.

1    Dated: December 2, 2025

2

3                                    Respectfully submitted,

4
                                     By:  */s/ Ishika Desai*
5

6                                            CHRISTINE V. SAMA (*pro hac vice* forthcoming)
                                             *CSama@goodwinlaw.com*
7                                            HUIYA WU (*pro hac vice* forthcoming)
                                             *HWu@goodwinlaw.com*
8                                            TIMOTHY KEEGAN (*pro hac vice* forthcoming)
                                             *TKeegan@goodwinlaw.com*
9                                            ARSHJIT RAINCE (*pro hac vice* forthcoming)
                                             *ARaince@goodwinlaw.com*
10                                           SAMUEL A. KUNZMAN (*pro hac vice* forthcoming)
                                             *SKunzman@goodwinlaw.com*
11                                           **GOODWIN PROCTER** LLP
                                             620 Eighth Avenue
12                                           New York, NY 10018
                                             Tel.: +1 212 813 8800
13

14                                           ISHIKA DESAI (SBN 340239)
                                             *IDesai@goodwinlaw.com*
15                                           **GOODWIN PROCTER** LLP
                                             525 Market Street, Floor 32
16                                           San Francisco, CA 94105
                                             Tel.: +1 415 733 6000
17

18                                           Attorneys for Plaintiffs
                                             AYR ENERGY INC., ANIRUDH REDDY EDLA,
19                                           and CHAD STUCKEY

20

21

22

23

24

25

26

27

28

AYR ENERGY INC.'S COMPLAINT                                      CASE NO. 3:25-CV-10345